# BURKE v. SOUTHERN PACIFIC RAILROAD COMPANY.

# LAMPRECHT v. SOUTHERN PACIFIC RAILROAD COMPANY.

### CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

Nos. 279, 280. Argued January 13, 14, 1913.—Decided June 22, 1914.

The act of July 27, 1866, making a grant of alternate odd numbered sections of public land to the Southern Pacific Railroad Company in aid of the construction of its main-line railroad did not include mineral lands, but on the contrary excluded them from its operation

and provided that the company should receive other lands as indemnity for them.

The administration of the grant, including the issue of patents following the construction of the road, was committed to the Land Department of which the Secretary of the Interior is the supervising officer.

It was contemplated by the granting act that the mineral or non-mineral character of the lands should be determined by the Land Department and that, depending upon the result, patents should issue or indemnity be allowed.

The patents were to be the legally appointed evidence that the lands described in them had passed to the company under the grant.

A patent issued under such a grant is to be taken, upon a collateral attack, as affording conclusive evidence of the non-mineral character of the land and of the regularity of the acts and proceedings resulting in its issue, and, upon a direct attack, as affording such presumptive evidence thereof as to require plain and convincing proof to overcome it.

If the land officers are induced by false proofs to issue such a patent for mineral lands, or if they issue it fraudulently or through mere inadvertence, a bill in equity on the part of the Government will lie to cancel the patent and regain the title; or, in the like circumstances, a prior mineral claimant who had acquired such rights in the land as to entitle him to protection may maintain a bill to have the patentee declared a trustee for him; but such a patent is merely voidable, not void, and cannot be successfully attacked by a stranger who had no interest in the land at the time the patent was issued and was not prejudiced by it.

One who relocates land under the mining law (Rev. Stat., § 2324) by reason of the failure of a prior locator to perform the required annual assessment or development work is not in privity with such prior locator.

The officers of the Land Department are without authority to insert in patents exceptions not contemplated by law, and when they place unauthorized exceptions in patents the exceptions are void.

An exception inserted in patents issued under the grant here under consideration to the effect that if any of the lands described should be found to be mineral the same should be excluded from the operation of the patents is unauthorized and void, because the granting act contemplated that the patents should effectually and unconditionally pass the title.

An agreement between the railroad company and the land officers that such an exception in the patents should be effective is of no greater

force as an estoppel than the exception itself, and the latter is of no force whatever.

The terms of the patent whereby the Government transfers its title to public land are not open to negotiation or agreement. The patentee has no voice in the matter. It in no wise depends upon his consent or will. Neither can the land officers enter into any agreement upon the subject. They are not principals but agents of the law, and must heed only its will.

If the land officers enter into any forbidden arrangement whereby public land is transferred to one not entitled to it, the patent may be annulled at the suit of the Government, but those officers cannot alter the effect which the law gives to a patent while it is outstanding.

The joint resolution of June 28, 1870, relating to this grant did not authorize the use of any excepting clause in the patents.

THE facts, which involve the construction and validity of patents for land issued to the Southern Pacific Railroad Company under the Land Grant Act of July 27, 1866, and the effect of provisions in the patents as to the effect of subsequent discovery of minerals, are stated in the opinion.

*Mr. Frederic R. Kellogg* and *Mr. Roberts Walker,* with whom *Mr. Edmund Burke, pro se,* was on the brief, for Burke.

*Mr. D. J. Hinkley,* with whom *Mr. T. J. Butler* was on the brief, for Lamprecht and Aiken, trustees.

*Mr. Maxwell Evarts,* with whom *Mr. Henry W. Clark, Mr. Gordon M. Buck* and *Mr. A. A. Hoehling, Jr.,* were on the brief, for the Southern Pacific Railroad Co.

By leave of court, *The Solicitor General* filed a memorandum on behalf of the United States.

MR. JUSTICE VAN DEVANTER delivered the opinion of the court.

In 1910 Edmund Burke filed a bill in equity in the Circuit Court of the United States for the Southern District

of California, against the Southern Pacific Railroad Company, the Kern Trading and Oil Company, and several individuals, wherein he sought a decree establishing certain rights claimed by him in five sections of land in Fresno County, California, and enjoining the defendants from asserting any right or interest therein. A cross-bill was filed by J. I. Lamprecht and other individual defendants, and the two corporate defendants demurred to both bills. The demurrers were sustained and a decree was entered dismissing the bills, for reasons assigned in an opinion announced the same day in *Roberts* v. *Southern Pacific Co.*, 186 Fed. Rep. 934. The complainant and cross-complainants appealed to the Circuit Court of Appeals, and it certified the case here under the Judicial Code, § 239, for instruction upon designated questions of law.

According to the certificate, the bill alleged, in substance, that in 1892 the five sections were public lands and were located as placer mining claims under the mining laws of the United States, each location being preceded by a discovery of mineral within its limits; that on May 9, 1892, the railroad company, with knowledge of these locations, made application at the local land office to have the five sections, with others, patented to it under the land grant made to it by the act of July 27, 1866, c. 278, 14 Stat. 292, §§ 3, 4, 18, and the joint resolution of June 28, 1870, 16 Stat. 382, No. 87, and did then corruptly cause one Madden, its land agent, to make and present at such land office, in support of such application, a false and fraudulent affidavit stating that the application contained a correct list of lands inuring to the railroad company under its grant, and that the listed lands were vacant, unappropriated and not interdicted, mineral or reserved lands; that no notice of such application was given to any of the placer claimants, and no hearing was had in the local office or in the Land Department with the purpose of

determining the character of the lands; that on July 10, 1894, without any such investigation or determination, a patent was issued to the railroad company purporting to convey to it, among other lands, the five sections in controversy; that the patent contained a clause reading: "Excluding and excepting all mineral lands should any such be found in the tracts aforesaid, but this exclusion and exception, according to the terms of the statute, shall not be construed to include coal and iron lands"; that the railroad company accepted the patent and caused it to be recorded in Fresno County; that in virtue of the patent the railroad company claims to own all the lands described therein, including the five sections; that in March, 1909, the original mineral claimants having failed to perform the required assessment or development work for the preceding year, the complainant and certain associates of his entered upon the five sections and relocated the same as placer mining claims under the mining laws of the United States, each of the new locations being preceded by a discovery of mineral within its limits; that the lands contain petroleum in commercial quantities, which makes them more valuable for mining than for agricultural purposes; that the complainant is the owner of an undivided one-tenth interest in the mining claims created by the new locations; and that the oil company, although claiming as a lessee of the railroad company, is a mere instrument of the latter, being entirely owned, dominated and controlled by it.

According to the certificate, the cross-bill set forth substantially a like state of facts, sought the same relief, and also contained the following allegation: "These cross-complainants further say and show unto the court that the said Southern Pacific Railroad Company, with full knowledge of all the facts and circumstances herein stated and alleged, did, for itself, its successors and assigns forever, accept and assent to, and submit to, and agree to

be bound by each and all of the provisions, stipulations, terms, conditions, restrictions, limitations, exclusions and reservations in said Act and Joint Resolution, and in said patent, or either or any of them contained, and so accepting the same and assenting and submitting thereto, and agreeing to be bound thereby, did receive and accept said alleged patent and cause the same to be recorded in the office of the Recorder of the County of Fresno, and State of California, and that said defendant, Southern Pacific Railroad Company, and all persons claiming any interest in said lands or any part thereof, under or through it by virtue of said Act of Congress and Joint Resolution, and said patent or any or either of them, are bound by all of said provisions, stipulations, terms, conditions, restrictions, limitations, exclusions, exceptions and reservations, and are in equity and in conscience estopped to resist or deny the binding force and effect of same or any part or any thereof."

The questions propounded in the certificate are as follows:

"FIRST. Did the said grant to the Southern Pacific Railroad Company include mineral lands which were known to be such at or prior to the date of the patent of July 10, 1894?

"SECOND. Does a patent to a railroad company under a grant which excludes mineral lands, as in the present case, but which is issued without any investigation upon the part of the officers of the Land Office or of the Department of the Interior as to the quality of the land, whether agricultural or mineral, and without hearing upon or determination of the quality of the lands, operate to convey lands which are thereafter ascertained to be mineral?

"THIRD. Is the reservation and exception contained in the grant in the patent to the Southern Pacific Railroad Company void and of no effect?

"FOURTH. If the reservation of mineral lands as ex-

pressed in the patent is void, then is the patent, upon a collateral attack, a conclusive and official declaration that the land is agricultural and that all the requirements preliminary to the issuance of the patent have been complied with?

"FIFTH. Is petroleum or mineral oil within the meaning of the term 'mineral' as it was used in said acts of Congress reserving mineral land from the railroad land grants?

"SIXTH. Does the fact that the appellant was not in privity with the Government in any respect at the time when the patent was issued to the railroad company prevent him from attacking the patent on the ground of fraud, error or irregularity in the issuance thereof as so alleged in the bill?

"SEVENTH. If the mineral exception clause was inserted in the patent with the consent of the defendant, Southern Pacific Railroad Company, and under an understanding and agreement between it and the officers of the Interior Department, that said clause should be effective to keep in the United States title to such of the lands described in the patent as were, in fact, mineral, are the defendants, Southern Pacific Railroad Company and the Kern Trading and Oil Company, estopped to deny the validity of said clause?"

At the outset it is well to observe that this is not a suit by the Government to cancel or annul a patent for fraud practiced upon the land officers in its procurement or for any fraudulent act, error of law, or mistake committed by them in issuing it (see *United States* v. *Minor*, 114 U. S. 233; *United States* v. *San Jacinto Tin Co.*, 125 U. S. 273; *United States* v. *Trinidad Coal Co.*, 137 U. S. 160; *Germania Iron Co.* v. *United States*, 165 U. S. 379); nor is it a suit to have one to whom a patent has issued declared a trustee for another who, at the time of its issue, had acquired such a right to the land as to entitle him to that form of equitable relief (see *Silver* v. *Ladd*, 7 Wall. 219, 228; *Lee* v.

*Johnson,* 116 U. S. 48; *Duluth & Iron Range Railroad Co.* v. *Roy,* 173 U. S. 587; *Svor* v. *Morris,* 227 U. S. 524). On the contrary, the suit is one wherein rights asserted under a patent are called in question by parties whose only claim to the land was initiated more than fourteen years after the date of the patent.

As the fifth question has been presented in separate briefs and the occasion for considering the other questions turns upon the answer to it, we take it up first. It is: "Is petroleum or mineral oil within the meaning of the term 'mineral' as it was used in said acts of Congress reserving mineral land from the railroad land grants?"

This granting act, like several others of that period, expressly excluded from its operation "all mineral lands" other than iron and coal lands. No attempt was made at defining "mineral lands," and doubtless the ordinary or popular signification of that term was intended. Apparently it was used in a sense which, if not restricted, would embrace iron and coal lands, else care hardly would have been taken to declare that it should not include them. This was deemed a reasonable inference in *Northern Pacific Railway Co.* v. *Soderberg,* 188 U. S. 526, where a contention that it embraced only metalliferous lands was rejected. The question there was, whether it included lands containing valuable bodies of granite, and the holding was that it did. While avoiding an exact definition, the court was of opinion that it comprehended all lands "chiefly valuable for their deposits of a mineral character, which are useful in the arts or valuable for purposes of manufacture."

Petroleum has long been popularly regarded as a mineral oil. As its derivation indicates, the word means "rock oil," an oily substance so named because found naturally oozing from crevices in rocks. Its existence in this country was known from very early times, and when this and other railroad land grants, containing an

exception of mineral lands, were made, the extraction of oil from its natural reservoir in subterranean rocks had come to be a promising industry and was extending over an increasing area through discoveries of new oil fields. An official report laid before Congress a few months before this grant was made showed that the daily output of the oil wells in Pennsylvania, Ohio, West Virginia, and Kentucky was 12,000 barrels. H. R. Ex. Doc. No. 51, 39th Cong., 1st Sess. In the same year the Supreme Court, of Pennsylvania, in disposing of an oil-land controversy, not only treated the oil as a mineral but spoke of the work of extracting it from the containing rocks as "mining for oil," and, in concluding the opinion, said: "Until our scientific knowledge on the subject is increased, this is the light in which the courts will be likely to regard this valuable production of the earth." *Funk* v. *Haldeman,* 53 Pa. St. 229. And in another case that court said: "It is a mineral substance obtained from the earth by a process of mining, and lands from which it is obtained may with propriety be called mining lands." *Gill* v. *Weston,* 110 Pa. St. 312, 317. Its mineral character has also been affirmed by the courts of other States. *Williamson* v. *Jones,* 39 W. Va. 231, 256; *Kelley* v. *Ohio Oil Co.,* 57 Oh. St. 317, 328; *Murray* v. *Allred,* 100 Tennessee, 100; *Wagner* v. *Mallory,* 169 N. Y. 501, 505. Congress at different times has spoken of it as a mineral (15 Stat. 58, 59, c. 41, § 1; Id. 125, 167, c. 186, § 109; 29 Stat. 526, c. 216; 32 Stat. 691, 702, c. 1369, § 42; 36 Stat. 847, c. 421), and this court did so in *Ohio Oil Co.* v. *Indiana,* 177 U. S. 190, 202.

In the legislation of Congress the term "mineral lands" is not confined to railroad land grants. It occurs in the mining laws, in an excepting clause in the homestead law, and in like clauses in other public-land laws. Evidently it has the same meaning in all. The administration of these laws has rested with the Land Department, and there-

fore its course of action in respect of oil-bearing lands—
whether it has held them to be mineral or otherwise—
requires to be noticed.   The various mining circulars,
instructions and decisions, as published from time to time,
show that the matter probably was not considered prior
to the first mining circular, July 15, 1873, but that since
then the Department has regarded petroleum as a mineral
and has treated lands chiefly valuable therefor as mineral
lands.[1]   With a single exception, the rulings have been
uniform, and lands of great value have passed into private
ownership under them.   The single exception is the case
of *Union Oil Co.*, 23 L. D. 222, 226, decided August 27,
1896, which was revoked on a motion for review No-
vember 6, 1897, 25 L. D. 351.   It appears from the later
decision that action upon other pending cases turning
upon the same question had been suspended in the mean-
time, so, practically speaking, there has been no break in
the Department's rulings.   The case of *Union Oil Com-
pany* presented a controversy between that company and
the Southern Pacific Railroad Company over a tract of
land in California, the former claiming under a placer
mining claim and insisting that the land was chiefly valu-
able for petroleum and therefore mineral, and the latter
seeking a patent under its land grant and insisting that
the land, even if chiefly valuable for petroleum, was not
mineral.   In the original decision the Secretary of the
Interior held that the word "mineral" embraced only
"the more precious metals," such as "gold, silver, cinna-
bar, etc.," but on the rehearing this view was rejected
and the prior rulings holding petroleum to be a mineral

---

[1] Circular July 15, 1873, Copp's Mineral Lands, 61; Letter of Com-
missioner Burdett, January 30, 1875, Sickles' Mining Laws, 491; *Max-
well* v. *Brierly*, 10 Copp's L. O. 50; Instructions January 30, 1883,
1 L. D. 572; *Roberts* v. *Jepson*, 4 L. D. 60; *Piru Oil Co.*, 16 L. D. 117;
*Union Oil Co.*, 25 L. D. 351; *McQuiddy* v. *California*, 29 L. D. 181;
*Tulare Oil Co.* v. *Southern Pacific Railroad Co.*, 29 L. D. 269.

were reaffirmed and applied, the railroad company's application for a patent being denied.

' Notwithstanding these persuasive considerations for now regarding petroleum lands as mineral lands within the meaning of the excepting clause in the granting act, we are asked to give effect to the strictly scientific view that petroleum is a resultant of the decomposition of organic matter under certain conditions of temperature and pressure and therefore is not a mineral. As we understand it, scientists are not in full accord upon this point, some ascribing to petroleum an inorganic origin.ˑ Encyclopædia Britannica, 11th ed., Vol. 21, p. 318. But, passing this seeming divergence in opinion and assuming that when subjected to a strictly scientific test petroleum is not a mineral, we think that is not the test contemplated by the statute. It was dealing with a practical subject in a practical way, and we think it used the words "mineral lands," and intended that they should be applied, in their ordinary and popular sense. In that sense, as before indicated, they embrace lands chiefly valuable for petroleum.

Our answer to the fifth question must therefore be in the affirmative.

The other questions are so closely related one to another and turn so largely upon principles of general application to controversies arising out of the public-land laws, including railroad land grants, that it seems the better course to consider them in a general way in connection with those principles, and then to come to the specific answers to be given to them separately.

We first notice a contention advanced on the part of the mineral claimants, to the effect that the grant to the railroad company was merely a gift from the United States, and should be construed and applied accordingly. The granting act not only does not support the contention but refutes it. The act did not follow the building of

the road but preceded it. Instead of giving a gratuitous reward for something already done, the act made a proposal to the company to the effect that if the latter would locate, construct and put into operation a designated line of railroad, patents would be issued to the company confirming in it the right and title to the public lands falling within the descriptive terms of the grant. The purpose was to bring about the construction of the road, with the resulting advantages to the Government and the public, and to that end provision was made for compensating the company, if it should do the work, by patenting to it the lands indicated. The company was at liberty to accept or reject the proposal. It accepted in the mode contemplated by the act, and thereby the parties were brought into such contractual relations that the terms of the proposal became obligatory on both. *Menotti* v. *Dillon,* 167 U. S. 703, 721. And when, by constructing the road and putting it in operation, the company performed its part of the contract, it became entitled to performance by the Government. In other words, it earned the right to the lands described. Of course, any ambiguity or uncertainty in the terms employed should be resolved in favor of the Government, but the grant should not be treated as a mere gift.

Two distinct land grants were made to the Southern Pacific Railroad Company, one on behalf of the construction of a main line, and the other (act March 3, 1871, 16 Stat. 573, 579, c. 122, § 23) on behalf of a branch line. We are not here concerned with the latter. The former was made by the act of July 27, 1866, 14 Stat. 292, c. 278. That act first made provision for the construction of a line of railroad, by the Atlantic & Pacific Railroad Company, from Springfield, Missouri, westward through northern Arizona to the Pacific Ocean, and by its third and fourth sections made the following grant of public lands to that company:

"SEC. 3. That there be, and hereby is, granted to the Atlantic and Pacific Railroad Company, its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores, over the route of said line of railway and its branches, every alternate section of public land, *not mineral,* designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line, as said company may adopt, through the Territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any State, and whenever, on the line thereof, the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from preëmption or other claims or rights, at the time the line of said road is designated by a plat thereof, filed in the office of the commissioner of the general land office, and whenever, prior to said time, any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers, or preëmpted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the Secretary of the Interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections, and not including the reserved numbers: . . . *Provided, further, That all mineral lands be, and the same are hereby, excluded from the operations of this act, and in lieu thereof a like quantity of unoccupied and unappropriated agricultural lands in odd-numbered sections nearest to the line of said road, and within twenty miles thereof, may be selected as above provided: And provided further,* That the word 'mineral,' when it occurs in this act, shall not be held to include iron or coal: . . .

"SEC. 4. That whenever said Atlantic and Pacific Rail-

road Company shall have twenty-five consecutive miles
of any portion of said railroad and telegraph line ready
for the service contemplated, the President of the United
States shall appoint three commissioners to examine the
same, who shall be paid a reasonable compensation for
their services by the company, to be determined by the
Secretary of the Interior; and if it shall appear that
twenty-five consecutive miles of said road and telegraph
line have been completed in a good, substantial and work-
manlike manner, as in all other respects required by this
act, the commissioners shall so report under oath, to the
President of the United States, and patents of lands, as
aforesaid, shall be issued to said company, confirming to
said company the right and title to said lands situated
opposite to and coterminous with said completed section
of said road. And from time to time, whenever twenty-
five additional consecutive miles shall have been con-
structed, completed, and in readiness as aforesaid, and
verified by said commissioners to the President of the
United States, then patents shall be issued to said com-
pany conveying the additional sections of land as afore-
said, and so on as fast as every twenty-five miles of said
road is completed as aforesaid."

By its eighteenth section the act made provision for the
construction by the Southern Pacific Railroad Company
of a connecting line of railroad from the eastern boundary
of California to San Francisco, and in that connection
made the grant now under consideration. That section
reads:

"That the Southern Pacific Railroad, a company incor-
porated under the laws of the State of California, is hereby
authorized to connect with the said Atlantic and Pacific
Railroad, formed under this act, at such point, near the
boundary line of the State of California, as they shall
deem most suitable for a railroad line to San Francisco,
and shall have a uniform gauge and rate of freight or fare

with said road; and in consideration thereof, to aid in its construction, shall have similar grants of land, subject to all the conditions and limitations herein provided, and shall be required to construct its road on the like regulations, as to time and manner, with the Atlantic and Pacific Railroad herein provided for."

Turning to §§ 3 and 4, as must be done, to ascertain the nature, extent, conditions and limitations of the grant made by this section, it will be seen that it was of "every alternate section of public land, not mineral, designated by odd numbers," etc., and was accompanied by a declaration "That all mineral lands be, and the same are hereby, excluded from the operations of this act, and in lieu thereof a like quantity of unoccupied and unappropriated agricultural lands in odd-numbered sections nearest to the line of said road, and within twenty miles thereof, may be selected as above provided." Words hardly could make it plainer that mineral lands were not included but expressly excluded. This is fully recognized by counsel on both sides. But by whom and when was it to be determined whether lands otherwise within the grant were mineral and therefore excluded, or non-mineral and therefore included? How long was the question of the exclusion or inclusion of particular sections to be an open one? Was it to depend upon a discovery of mineral at any time in the future, even a hundred years after the completion of the railroad, or was it intended that the mineral or non-mineral character of the lands should be determined in administering the grant, and that, depending on the result, patents should issue or indemnity be allowed? We think these questions find clear and decisive answers in the granting act when considered in the light of settled principles of general application to the administration of the public-land laws, including railroad land grants.

As has been seen, the exclusion was of "all mineral lands." It was not a mere reservation of minerals, but

an exclusion of mineral lands, coupled with a provision that the company should receive other lands, not mineral, in lieu of them. This shows that a determination of the character of the lands, as mineral or non-mineral, was plainly contemplated. Besides, there was an exclusion of all sections and parts of sections "granted, sold, reserved, occupied by homestead settlers, or preëmpted, or otherwise disposed of" when the line of the road should be definitely located, and this was followed by a similar provision for lieu lands. The two exclusions and the indemnity provisions made it practically imperative that there be an authoritative identification of the lands passing under the grant and of those excluded, for otherwise great uncertainty in titles, conflicting claims, and vexatious litigation would be inevitable. Appreciative of this, Congress confided the identification of the lands, both included and excluded, to the Land Department, of which the Secretary of the Interior is the supervising officer. We say their identification was confided to that Department, because the granting act expressly provided for the issue of patents "confirming to said company the right and title to said lands," obviously meaning the lands granted but not the excluded lands, and also directed that the indemnity lands be selected "under the direction of the Secretary of the Interior," and because that Department was already expressly charged with the administration and execution of all public-land laws as to which it was not specially provided otherwise. Rev. Stat., §§ 441, 453, 2478. In *Catholic Bishop of Nesqually* v. *Gibbon,* 158 U. S. 155, 166, 167, which related to a grant, the identification and extent of which depended, as here, upon an ascertainment of matters of fact made material by the granting act, this court said: "While there may be no specific reference in the act of 1848 of questions arising under this grant to the land department, yet its administration comes within the scope of the general

powers vested in that department. . . . It may be laid down as a general rule that, in the absence of some specific provision to the contrary in respect to any particular grant of public land, its administration falls wholly and absolutely within the jurisdiction of the Commissioner of the General Land Office, under the supervision of the Secretary of the Interior. It is not necessary that with each grant there shall go a direction that its administration shall be under the authority of the land department. It falls there unless there is express direction to the contrary."

True, the grant now under consideration was *in præsenti* in the sense that the title to the granted lands, when they should be identified, passed as of the date of the granting act; but, as has been indicated, the act did not itself identify them, and in the nature of things that was not practicable. It was not certain that the road would be constructed, or what lands would be free from other claims at the time of its definite location, or what would be mineral. This led to the use of general descriptive terms which required to be applied to particular lands, should the road be constructed. And so it was that provision was made for issuing patents "confirming to said company the right and title to said lands" after construction. A real necessity would then arise for identifying the lands passing under the grant. This was obviously the purpose of the patents. They were to be in confirmation of the company's "right and title," and so were to be the legally appointed evidence that the lands described in them had passed to the company under the grant.

As it plainly was not intended that patents should issue for excluded lands, to which the company was not to have any right or title, the direction respecting the issue of patents necessarily carried with it the power and the duty of determining in every instance whether the land came within the terms of the grant, or for any reason was ex-

cluded from it, and of giving appropriate effect to the
result by granting or refusing a patent. This is the theory
upon which the Land Department uniformly has proceeded
in the administration and adjustment of this and other
railroad land grants, and this court repeatedly has pro-
nounced it the true theory. The departmental view and
practice are shown in *Central Pacific Railroad Co. v.
Valentine*, 11 L. D. 238, where it was said by Secretary
Noble (p. 243): "It is not questioned that the Land De-
partment has jurisdiction until patent, or certification,
as the case may be, to the company, to determine whether
any of the lands within the lateral limits of the grant had
been, at the time the line of the road was definitely fixed,
'sold, reserved, or otherwise disposed of,' or was subject
to 'a preëmption or homestead claim,' and therefore ex-
cepted from the grant. That such jurisdiction exists,
there can be no doubt, and I am unable to perceive upon
what principle of logic or process of reasoning it can be
claimed that a like jurisdiction does not exist for the pur-
pose of determining whether the lands are mineral, and
for that reason, excepted from the grant. Manifestly,
the jurisdiction to determine the exception is the same,
whether the inquiry is instituted as to the character of
the land, or as to its particular status, at the date when the
rights of the company attached under the grant." Again
(p. 244): "All the lands within the primary limits of a
railroad grant do not necessarily pass to the railroad, but
only such as are not within the exceptions named in the
grant, and the Secretary of the Interior is clothed with the
authority of determining in the first instance which lands
pass by the grant and which do not pass, and this he does
by approving lists for certification or patent." And
again (p. 246): "Now, this jurisdiction is in the Land
Department, and it continues, as we have seen, until the
lands have been either patented or certified to, or for the
use of, the railroad company. By reason of this jurisdic-

tion it has been the practice of that Department, for many years past, to refuse to issue patents to railroad companies for lands found to be mineral in character, at any time before the date of the patent."

The same subject came before this court in *Barden* v. *Northern Pacific Railroad Co.*, 154 U. S. 288. The case arose under a grant (July 2, 1864, c. 217, 13 Stat. 365) containing an exclusion of mineral lands, provisions for indemnity, and a direction for patents, identical with those now under consideration; the grant being followed by a joint resolution (January 30, 1865, 13 Stat. 567) which, referring to that and other grants made at the same session, declared that none "shall be so construed as to embrace mineral lands, which in all cases shall be, and are, reserved exclusively to the United States, unless otherwise specially provided in the act or acts making the grant." On the part of the railroad company it was insisted that the conditions existing when the line of railroad was definitely located should be taken as decisive of whether lands were mineral or otherwise in the sense of the mineral-land exclusion, and much apprehension was expressed lest a different ruling would put the matter so at large that a discovery of mineral at any time in the future would defeat titles supposedly complete. By leave of the court, the Solicitor General appeared on behalf of the Government, and took the position shown by the following extract from his brief (154 U. S. 296–298; Brief, pp. 4–7):

"The act itself provides for the issuing of patents to the railroad company, and contemplates therefore that the Secretary of the Interior, prior to such issue, shall determine whether the lands sought to be patented come within the terms of the grant; in other words, whether they are in odd sections, unappropriated, not mineral, etc.

"But it is said that the Secretary of the Interior has no authority to patent mineral lands, and that a patent for

lands, in fact mineral, would afford no protection to the railroad company in the event of the future discovery of precious metals therein. This is a mistake. After the Secretary of the Interior has decided that any particular lands are not mineral, and has issued a patent therefor, the title is not liable to be defeated by the subsequent discovery of minerals. The authorities upon this point are cited in Mr. Shields' original brief (pp. 46 to 60).

"The point is also covered by the case of *Davis* v. *Weibbold*, 139 U. S. 507, where a patent was issued for a town site, and minerals were subsequently discovered in the lands patented. But it was held that the title was not affected by such discovery, and that the provision of the town-site act (Rev. Stat., § 2392) that 'no title shall be acquired to any mine of gold, silver, cinnabar, or copper,' does not apply where the mines were discovered after a patent has been issued.

"Mr. Justice Field, delivering the opinion of the court, quotes with approval, at page 521, the following language of Judge Sawyer in *Cowell* v. *Lammers* [21 Fed. Rep. 200, 206]: 'There must be some point of time when the character of the land must be finally determined, and, for the interest of all concerned, there can be no better point to determine this question than at the time of issuing the patent.'

"And again, at page 523, he quotes with approval the following language of Mr. Justice Lamar, while Secretary of the Interior [5 L. D. 194]: 'The issue of said patent was a determination by the proper tribunal that the lands covered by the patent were granted to said company, and hence, under the proviso of said act, were not mineral at the date of the issuance of said patent.'

"And again, page 524: 'The grant or patent, when issued, would thus be held to carry with it the determination of the proper authorities that the land patented was not subject to the exception stated.'

"In *Moore* v. *Smaw*, 17 California, 199, it was decided, in the first opinion delivered by Mr. Justice Field as chief justice of the supreme court of California, that the patent of the United States passes title to minerals.

"Of course, if the railroad company knows at the time of receiving a patent. that the lands covered by it are mineral, a case of fraud is presented which entitles the Secretary of the Interior to have the patent canceled, as was done in *Morton* v. *Nebraska*, 21 Wall. 660, and in *The Western Pacific Railroad Company* v. *The United States*, 108 U. S. 510. But, barring cases of fraud, the issuing of a patent by the Secretary of the Interior to the railroad company gives it an absolute title, not liable to be defeated by the subsequent discovery of minerals.

"Here, then, is a method of adjusting the company's grant according to the procedure contemplated by the act itself, which protects fully the interests of both the Government and the railroad, and which is in accordance with the practice which has always prevailed in the Department of the Interior." Citing Secretary Noble's decision in *Central Pacific Railroad Co.* v. *Valentine, supra.*

The court rejected the contention that the conditions existing at the date of definite location were decisive of whether the land was mineral or non-mineral, and held that the question remained an open one until the issue of a patent. In the latter connection the court referred to prior decisions respecting the power and duty of the Land Department, in issuing patents, to inquire and determine whether the lands are of the class prescribed, whether there are other claims to them, and whether the applicant is entitled to a transfer of the title; reaffirmed its ruling in *Smelting Co.* v. *Kemp*, 104 U. S. 636, 640, that a patent not only "operates to pass the title, but is in the nature of an official declaration by that branch of the Government to which the alienation of the public lands, under the law, is intrusted, that all the requirements preliminary

VOL. CCXXXIV—44

to its issue have been complied with;" and further said (pp. 328, 329):

"If the Land Department must decide what lands shall not be patented because reserved, sold, granted, or otherwise appropriated, or because not free from preëmption or other claims or rights at the time the line of the road is definitely fixed, it must also decide whether lands are excepted because they are mineral lands. . . . If, as suggested by counsel, when the Secretary of the Interior has under consideration a list of lands to be patented to the Northern Pacific Railroad Company, it is shown that part of said lands contain minerals of gold and silver, discovered since the company's location of its road opposite thereto, he would not perform his duty, stated in *Knight* v. *Land Association*, 142 U. S. 161, 178, as the 'supervising agent of the government to do justice to all claimants and preserve the rights of the people of the United States,' by certifying the list until corrected in accordance with the discoveries made known to the department. . . .

"There are undoubtedly many cases arising before the Land Department in the disposition of the public lands where it will be a matter of much difficulty on the part of its officers to ascertain with accuracy whether the lands to be disposed of are to be deemed mineral lands or agricultural lands, and in such cases the rule adopted that they will be considered mineral or agricultural as they are more valuable in the one class or the other, may be sound. The officers will be governed by the knowledge of the lands obtained at the time as to their real character. The determination of the fact by those officers that they are one or the other will be considered as conclusive."

And then, after quoting approvingly what we have already extracted from Secretary Noble's decision in *Central Pacific Railroad Co.* v. *Valentine, supra,* it was added (p. 330): "It is true that the patent has been issued

in many instances without the investigation and consideration which the public interest requires; but if that has been done without fraud, though unadvisedly by officers of the Government charged with the duty of supervising and attending to the preparation and issue of such patents, the consequence must be borne by the Government until by further legislation a stricter regard to their duties in that respect can be enforced upon them."

Of the decision in that case it was concisely said in *Shaw* v. *Kellogg*, 170 U. S. 312, 339: "It is true there was a division of opinion, but that division was only as to the time at which and the means by which the non-mineral character of the land was settled. The minority were of the opinion that the question was settled at the time of the filing of the map of definite location. The majority, relying on the language in the original act of 1864 making the grant, and also on the joint resolution of January 30, 1865, which expressly declared that such grant should not be 'construed as to embrace mineral lands, which in all cases shall be and are reserved exclusively to the United States,' held that the question of mineral or non-mineral was open to consideration up to the time of issuing a patent. But there was no division of opinion as to the question that when the legal title did pass—and it passed unquestionably by the patent—it passed free from the contingency of future discovery of minerals."

The exclusion of mineral lands is not confined to railroad land grants, but appears in the homestead, desert-land, timber and stone, and other public-land laws, and the settled course of decision in respect of all of them has been that the character of the land is a question for the Land Department, the same as are the qualifications of the applicant and his performance of the acts upon which the right to receive the title depends, and that when a patent issues it is to be taken, upon a collateral attack, as affording conclusive evidence of the non-mineral character of

the land and of the regularity of the acts and proceedings resulting in its issue, and, upon a direct attack, as affording such presumptive evidence thereof as to require plain and convincing proof to overcome it. *Smelting Co.* v. *Kemp,* 104 U. S. 636, 641; *Steel* v. *Smelting Co.,* 106 U. S. 447; *Maxwell Land Grant Case,* 121 U. S. 325, 379–381; *Heath* v. *Wallace,* 138 U. S. 573, 585; *Noble* v. *Union River Logging Railroad,* 147 U. S. 165, 174; *Burfenning* v. *Chicago, &c. Railway Co.,* 163 U. S. 321, 323. In this respect no distinction is recognized between patents issued under railroad land grants and those issued under other laws; nor is there any reason for such a distinction.

Of course, if the land officers are induced by false proofs to issue a patent for mineral lands under a non-mineral-land law, or if they issue such a patent fraudulently or through a mere inadvertence, a bill in equity, on the part of the Government, will lie to annul the patent and regain the title, or a mineral claimant who then had acquired such rights in the land as to entitle him to protection may maintain a bill to have the patentee declared a trustee for him; but such a patent is merely voidable, not void, and cannot be successfully attacked by strangers who had no interest in the land at the time the patent was issued and were not prejudiced by it. *Colorado Coal & Iron Co.* v. *United States,* 123 U. S. 307, 313; *Diamond Coal Co.* v. *United States,* 233 U. S. 236, 239; *Germania Iron Co.* v. *United States,* 165 U. S. 379; *Duluth & Iron Range Railroad Co.* v. *Roy,* 173 U. S. 587, 590; *Hoofnagle* v. *Anderson,* 7 Wheat. 212, 214–5. In the last case this court said, speaking through Chief Justice Marshall: "It is not doubted that a patent appropriates land. Any defects in the preliminary steps, which are required by law, are cured by the patent. It is a title from its date, and has always been held conclusive against all those whose rights did not commence previous to its emanation. . . . If the patent has been issued irregularly, the Government

may provide means for repealing it; but no individual has a right to annul it, to consider the land as still vacant, and to appropriate it to himself." Of the same import are *Cooper* v. *Roberts*, 18 How. 173, 182; *Spencer* v. *Lapsley*, 20 How. 264, 273; *Ehrhardt* v. *Hogaboom*, 115 U. S. 67, 68.

The patent here in question was issued July 10, 1894. Apparently, the Government never brought a bill to have it vacated or annulled, and the time for doing so apparently expired in 1900 or 1901. Acts, March 3, 1891, 26 Stat. 1093, c. 559; March 2, 1896, 29 Stat. 42, c. 39, § 1; *United States* v. *Chandler-Dunbar Co.*, 209 U. S. 447, 450. Apparently, also, the prior mineral claimants never sought to have the patentee declared a trustee for them, for it is admitted that they abandoned their locations. The present mineral claimants, who are assailing the patent, claim under relocations made in March, 1909, more than fourteen years after the date of the patent and eight years after the apparent expiration of the time within which the Government could ask that it be vacated or annulled. Plainly, there is no privity between the earlier and later mineral claimants, for the relocations were not made in furtherance of the prior locations but in hostility to them. See Rev. Stat., § 2324.

But, referring to the clause in the patent, "excluding and excepting all mineral lands should any such be found in the tracts aforesaid," the contention is made, first, that the patent shows that the Land Department did not consider or determine whether the lands were mineral or not, and, second, that all lands embraced in the patent which then had been or thereafter should be discovered to be mineral were expressly excepted from the operation of the patent and therefore remained public lands. This contention must be tested in the light of the established practice in the Land Department in such matters and of the office which the granting act intended the patents to perform. The clause relied upon is not peculiar to this

patent or to those issued under this grant, but appears in all the patents issued from 1866 to 1904 under railroad land grants containing an exclusion of mineral lands. Its first mention in any public document was in the annual report of the Commissioner of the General Land Office for 1868. It was there said (pp. 152–154):

"In every case reported from the district land officers of selections made under the acts of 1862 and 1864, for the Pacific Railroad, the agent of the company in the first instance is required to state in his affidavit that the selections are not interdicted, mineral nor reserved lands, and are of the character contemplated by the grant. Upon the filing of lists with such affidavits attached, it is made the duty of registers and receivers to certify to the correctness of the selections in the particulars mentioned, and in other respects. They subsequently undergo scrutiny in this office, are tested by our plats, and by all the data on our files, sufficient time elapsing after the selections are made for the presentation of any objections to the department before final action is taken; and to more effectually guard the matter, there is inserted in all patents issued to said railroad company a clause to the following effect: 'Yet excluding and excepting from the transfer by these presents all mineral lands, should any such be found to exist in the tracts described in this patent, this exception, as required by statute, not extending to coal and iron land.' . . . It has been suggested to this office that the Government should appoint a commission to segregate the mineral from the residue of the public lands; but let anyone consider the vast amount of money expended by practical miners in excavations to test the value of mines, subsequently abandoned as worthless, and some idea may be formed of the time and expense such an undertaking would require, and how little confidence it would be likely to inspire. . . . The regulation of filing affidavits is simply a means of ascertaining the class

to which a particular tract of land may belong, and although it may not be the best that could be devised, it is the only practical mode that has suggested itself to meet the difficulty of disposing of different classes of land mingled together in such a way as to render it frequently impossible to tell, without great labor and expense, whether a particular subdivision belongs to one or the other class."

In addition to what was thus said respecting the affidavits and certificates required and the examination of whatever data were available, regulations were promulgated calling attention, among other things, to the mineral-land exclusion in the grants, directing that the lists be carefully and critically examined by the Register and Receiver and mineral lands be excluded therefrom, and prescribing forms of affidavits and certificates reciting, among other things, that the listed lands were non-mineral and of the character contemplated by the grant.[1]  It also appears from the published land decisions that hearings were often had in the local land offices to determine whether lands sought to be listed were mineral or otherwise, and that appeals in such matters were not infrequently heard by the Secretary of the Interior.[2]  From all this it is manifest that the excepting clause never was intended to take the place of an inquiry into the character of the land or to dispense with a determination of that question, and that its presence in the patents does not at all signify that no inquiry or determination was had. On the contrary, it appears that it was the accustomed practice to exact proofs respecting the character of the

---

[1] See 2 Lester's Land Laws, 362–365; 2 Copp's Land Laws, 715, 719, 727; 19 L. D. 21.

[2] See *Central Pacific Railroad Co.*, 8 L. D. 30; *Central Pacific Railroad Co.* v. *Valentine*, 11 L. D. 238; *North Star Mining Co.* v. *Central Pacific Railroad Co.*, 12 L. D. 608; *Southern Pacific Railroad Co.* v. *Allen Gold Mining Co.*, 13 L. D. 165; *California & Oregon Railroad Co.*, 16 L. D. 262; *Barden* v. *Northern Pacific Railroad Co.*, 19 L. D. 188.

land, to give opportunity for contests, and to give effect to whatever information was obtained. At most according to the Commissioner's report, the clause was intended to serve merely as an additional safeguard; and its words suggest that its use was with an eye to future discoveries rather than to existing conditions.

Coming to its effect in a patent, which is of more importance than how it came to be there, we find that this question came before the Land Department in the case of *Samuel W. Spong*, 5 L. D. 193. The tract in question had been patented to the Central Pacific Railroad Company under its grant, the patent containing the excepting clause. Spong applied at the local land office to enter the tract under the mining law, claiming that it was mineral and therefore excepted from the patent. The local officers refused his application, assigning as a reason that the title had passed to the company under the patent, and the Commissioner of the General Land Office affirmed their decision. The matter was then taken before Secretary Lamar, who sustained the decisions below, saying (p. 194): "The issue of said patent was a determination by the proper tribunal that the lands covered by the patent were granted to said company, and hence, under the proviso of said act, were not mineral at the date of the issuance of said patent." Again (p. 195): "In the case of *Deffeback* v. *Hawke* (115 U. S. 393), the court reviewed and commented on the several acts of Congress relative to the disposition of mineral lands, and held that the officers of the Land Department have no authority to insert in a patent any other terms than those of conveyance, with recitals showing a compliance with the law and the conditions which it prescribed." And again (p. 196): "While the exception of mineral lands from the grant to said company is clear and explicit, yet it does not appear from a careful consideration of the language of said grant that Congress intended to grant only such lands which may

after the lapse of an indefinite number of years prove to be agricultural in character." The question was also pre-sented in *Courtright* v. *Wisconsin Central Railroad Co.,* 19 L. D. 410. The land involved had been patented under a railroad land grant like that now before us, the patent containing the same exception. Courtright, claiming that the land was mineral, and was known to be such since before the patent, insisted that it remained public land and sought to make entry of it. The local officers held that this could not be done in the presence of the patent, and their ruling was sustained by the Commissioner. On appeal, Secretary Smith affirmed the action of the other officers, saying (p. 413):

"The issuing of patent is a determination by the De-partment that the lands embraced therein are of the character described in the grant.

\*     .   \*      ·\*      \*      \*      \*      \*      \*

"If it was the intention of the officers of the Govern-ment to leave as an open question the character of the lands embraced in the patent, then they acted without authority, for when patent issued, that was the end of the jurisdiction of the Department over the lands. The ex-ception contained in the patent went beyond 'giving ex-pression to the intent of the statute,' as construed by the supreme court, and added a restriction upon the grant which is not to be found in the granting act.

"I am therefore of the opinion that the Department has not jurisdiction to determine the character of the land in controversy after issuance of patent. If it be true that the lands in question contain minerals in paying quanti-ties, and that this fact was known to the officers or agents of the company at the date of selection, or date of patent, and they failed to make the fact known to the Depart-ment, such conduct was a fraud upon the Government, and the courts can grant relief."

It thus appears that the Land Department has regarded

the issuing of such a patent as a determination of the non-mineral character of the land and as effectually and unconditionally passing the title. There has been no departmental decision to the contrary. Indeed, on December 10, 1903, the Secretary of the Interior directed that the excepting clause be omitted from future patents, because he regarded it as without any warrant in law and void. 32 L. D. 342.

This clause was extensively considered by Circuit Judge Sawyer in *Cowell* v. *Lammers,* 21 Fed. Rep. 200. The patent in that case had been issued under the Central Pacific grant. The suit was to enjoin a trespass in the nature of waste, the complainant being the grantee of the railroad company and the defendant a miner who had located part of the patented tract as a lode mining claim. He had applied to the Land Department to enter the claim under the mining law, and his application had been rejected because the patent was outstanding. In granting the injunction the court said (p. 206): "The lands are either patentable under the act or they are not. If patentable, the issue of a patent is authorized. If not patentable, it is unauthorized, and the issue of a patent is, clearly, as conclusive evidence of the determination of the fact of patentability, upon a collateral attack, in the one case as in the other. Suppose it should afterwards turn out that all is mineral land. The exception would be as broad as the grant, and be void as an exception. Is it any the less so, in this class of cases, as to a part? . . . There must be some point of time when the character of the land must be finally determined, and, for the interest of all concerned, there can be no better point to determine this question than at the time of issuing the patent." Again (p. 208): "A patent upon its face should either grant or not grant. It must be seen from a construction of the language of the grant [patent] itself whether anything is granted or not, and, if anything be granted, what

it is.  There is no authority to issue a patent which, in
effect, only says if the lands herein described hereafter
turn out to be agricultural lands, then I grant them, but
if they turn out to be mineral lands, then I do not grant
them.  Such a patent would be so uncertain that it would
be impossible to determine, from the face of the patent,
whether anything is granted or not."

In principle, the effect of the excepting clause in the
patent is not an open one, under the decisions of this
court.  It is foreclosed by what has been held upon full
consideration.  In *Deffeback* v. *Hawke*, 115 U. S. 392,
where was involved the right to certain valuable townsite
improvements upon land patented as a placer mining
claim, the contention was advanced that as the owner
of the improvements was the prior occupant the patent
should have contained a reservation excluding them and
all rights necessary to their enjoyment from its operation,
but the contention was declared untenable, the court
saying (p. 406): "The land officers, who are merely agents
of the law, had no authority to insert in the patent any
other terms than those of conveyance, with recitals show-
ing a compliance with the law and the conditions which it
prescribed."  The case of *Davis* v. *Weibbold*, 139 U. S.
507, directly involved the validity of a clause in a town-
site patent declaring that no title should be thereby "ac-
quired to any mine of gold, silver, cinnabar or copper."
By the mining laws mineral lands were withdrawn from
disposal under other laws and the townsite law specially
declared that no title to any mine of gold, silver, cinnabar,
or copper should be acquired under its provisions.  The
defendant claimed under the townsite patent and a deed
of release and quit-claim from the probate judge, who
was the townsite trustee, and the plaintiff claimed under
a later patent for a mining claim located upon part of
the townsite and based upon an actual discovery of a
valuable vein of gold after the issue of the townsite patent.

The decision and the reasons for it are fully comprehended in the following extracts from the opinion:

(p. 519) "The exceptions of mineral lands from preemption and settlement and from grants to States for universities and schools, for the construction of public buildings, and in aid of railroads and other works of internal improvement, are not held to exclude all lands in which minerals may be found, but only those where the mineral is in sufficient quantity to add to their richness and to justify expenditures for its extraction, and known to be so at the date of the grant." (As shown in *Barden* v. *Northern Pacific Railroad Co.*, [19 L. D. 188] the word "grant" here means the patent and not the act making the grant.)

(p. 524) "It would seem from this uniform construction of that Department [1] of the Government specially intrusted with supervision of proceedings required for the alienation of the public lands, including those that embrace minerals, and also of the courts of the mining States, Federal and state, whose attention has been called to the subject, that the exception of mineral lands from grant in the acts of Congress should be considered to apply only to such lands as were at the time of the grant [patent] known to be so valuable for their minerals as to justify expenditure for their extraction. The grant or patent, when issued, would thus be held to carry with it the determination of the proper authorities that the land patented was not subject to the exception stated. There has been no direct adjudication upon this point by this court, but this conclusion is a legitimate inference from several of its decisions. It was implied in the opinion in *Deffeback* v. *Hawke*, already referred to, and in the cases of the *Colorado Coal & Iron Co.* v. *United States*, 123 U. S. 307, 328, and *United States* v. *Iron Silver Mining Co.*, 128 U. S. 673, 683."

---

[1] The reference is to several Land Department decisions cited and reviewed in that opinion.

(p. 525) "It would in many instances be a great impediment to the progress of such towns if the titles to the lots occupied by their inhabitants were subject to be overthrown by a subsequent discovery of mineral deposits under their surface. If their title would not protect them against a discovery of mines in them, neither would it protect them against the invasion of their property for the purpose of exploring for mines. The temptation to such exploration would be according to the suspected extent of the minerals, and being thus subject to indiscriminate invasion, the land would be to one having the title poor and valueless, just in proportion to the supposed richness and abundance of its products. We do not think that any such results were contemplated by the act of Congress, or that any construction should be given to the provision in question which could lead to such results."

(p. 527–8) "But we do not attach any importance to the exception, for the officers of the Land Department, being merely agents of the government, have no authority to insert in a patent any other terms than those of conveyance, with recitals showing compliance with the conditions which the law prescribes. Could they insert clauses in patents at their own discretion they could limit or enlarge their effect without warrant of law. The patent of a mining claim carries with it such rights to the land which includes the claim as the law confers, and no others, and these rights can neither be enlarged nor diminished by any reservations of the officers of the Land Department, resting for their fitness only upon the judgment of those officers. *Deffeback* v. *Hawke*, 115 U. S. 392, 406. . . . The laws of Congress provide that valuable mineral deposits in lands of the United States shall be open to exploration and purchase. They do not provide, and never have provided, that such mineral deposits in lands which have ceased to be public, and become the property of

private individuals, can be patented under any proceedings before the Land Department, or otherwise."

The case of *Shaw* v. *Kellogg*, 170 U. S. 312, related to a claim or right, conferred by statute, entitling its owner to select in a body about 100,000 acres "of vacant land, not mineral," in New Mexico, it being the duty of the Surveyor General "to make survey and location of the lands so selected," and this action being subject to the supervision of the Commissioner of the General Land Office. The owner of the right having made the selection, applied to the surveyor general in 1862 for the survey and location of the tract, and that officer reported the application to the Commissioner, saying in that connection that he had theretofore been informed that the purpose of the owner was to make such a selection as "would cover rich minerals in the mountains." The Commissioner replied that it was essential to the approval of the application by him that "it be accompanied by the certificates of the surveyor general and the register and receiver that the land· selected is vacant and not mineral." Such certificates were furnished, but the Commissioner hesitated to act upon them because they were not based upon personal knowledge, but information informally elicited from others, the lands being remote and in an unsurveyed region. Finally, the Commissioner concluded that "the difficulty" could "be avoided" by directing the Surveyor General to proceed and in approving the survey to add to his certificate of approval "the special reservation stipulated by the statute, but not to embrace mineral land." Being instructed accordingly, the Surveyor General, after the field notes and plat of the survey were completed, endorsed upon the field notes a mere approval and upon the plat an approval qualified by the words "subject to the conditions and limitations" of the statute, naming it. The field notes and plat were then forwarded to and accepted by the Commis-

sioner. No patent was issued, the approved survey taking the place of one under the statute. A few years later, when inquiries were made respecting the right of prospectors to take advantage of mineral discoveries in the tract, the Commissioner took the position that the approval of the survey operated as a determination that the land was of the class and character designated in the act; that the title had passed from the Government, and that, notwithstanding the apparently conditional approval, the Land Department was without authority to reopen the question of the character of the land. The case, as presented to this court, involved the possession of a mine located within the tract after the approval of the survey. The plaintiff claimed under the selection of 1862 and the defendant under the mining laws, the controversy turning upon the effect to be given to the condition in the approval of the survey. In disposing of that question the court reaffirmed and applied its rulings in *Deffeback* v. *Hawke,* and *Barden* v. *Northern Pacific Railroad Co., supra,* and said (p. 337):

"What is the significance of, and what effect can be given to, the clause inserted in the certificate of approval of the plat that it was subject to the conditions and provisions of the act of Congress? We are of opinion that the insertion of any such stipulation and limitation was beyond the power of the Land Department. Its duty was to decide and not to decline to decide; to execute and not to refuse to execute the will of Congress. It could not deal with the land as an owner and prescribe the conditions upon which title might be transferred. It was an agent and not principal. Congress had made a grant, authorized a selection within three years, and directed the Surveyor General to make survey and location, and within the general powers of the Land Department it was its duty to see that such grant was carried into effect and that a full title to the proper land was made. Un-

doubtedly it could refuse to approve a location on the ground that the land was mineral. It was its duty to decide the question—a duty which it could not avoid or evade. It could not say to the locator that it approved the location provided no mineral should ever thereafter be discovered, and disapproved it if mineral were discovered; in other words, that the locator must take the chances of future discovery of minerals. It was a question for its action and its action at the time. The general statutes of Congress in respect to homestead, preemption and townsite locations provide that they shall be made upon lands that are non-mineral, and in approving any such entry and issuing a patent therefor could it be tolerated for a moment that the Land Department might limit the grant and qualify the title by a stipulation that if thereafter mineral should be discovered the title should fail? It cannot in that way avoid the responsibility of deciding and giving to the party seeking to make the entry a full title to the land or else denying it altogether."

(p. 341) "But, it is said, no patent was issued in this case, and therefore the holding in the *Barden Case*, that the issue of a patent puts an end to all question, does not apply here. But the significance of a patent is that it is evidence of the transfer of the legal title. There is no magic in the word 'patent,' or in the instrument which the word defines. By it the legal title passes, and when by whatsoever instrument and in whatsoever manner that is accomplished, the same result follows as though a formal patent were issued."

(p. 343) "While the approval entered upon the plat by the Surveyor General under the direction of the Land Department was in terms 'subject to the conditions and provisions of section 6 of the act of Congress, approved June 21, 1860,' such limitation was beyond the power of executive officers to impose."

According to the statute relating to placer mining claims

the patent, save in an instance not material here, should contain an exception of any vein or lode *known* to exist within the boundaries of the claim *at the date of the application for patent*, but in the early patents the exception was so stated that it embraced any vein or lode *claimed or known* to exist *at the date of the patent*. The change was a material one, not only because of the difference between "claimed" and "known" but also because a year or so sometimes elapsed between the date of the application and that of the patent, and in the meantime a vein or lode might be discovered within the boundaries of the placer claim. Ultimately cases presenting the question of the effect of the exception as stated in the patents came before this court, and it was held that "the exception of the statute cannot be extended by those whose duty it is to supervise the issuing of the patent." *Sullivan* v. *Iron Silver Mining Co.*, 143 U. S. 431, 441, and cases cited.

These decisions are applicable and controlling here. The reasoning upon which they proceed compels their reaffirmance, and, besides, they have come to be recognized as establishing a rule of property. Not only has the Land Department accepted them as determinative of the invalidity of the excepting clause now before us, but innumerable titles within the limits of the western railroad land grants have been acquired with a like understanding and are now held in the justifiable belief that they are impregnable.

We come now to a contention which seeks to distinguish patents under this grant from those under other railroad grants. It is that the insertion of the excepting clause in the former was expressly authorized by Congress. Evidently this has not been the view of the Land Department. It not only began to use the clause before this grant was made, but used it in all patents of this class; and when, in December, 1903, its use was discontinued, the order embraced this grant along with the others. But passing

this as suggestive but not controlling, we turn to the joint resolution of June 28, 1870, upon which the contention is rested. Its chief purpose was to sanction a route which the Secretary of the Interior had disapproved. *Southern Pacific Railroad Co.* v. *United States*, 183 U. S. 519, 523. It reads as follows (16 Stat. 382, * No. 87):

"That the Southern Pacific Railroad Company of California may construct its road and telegraph line, as near as may be, on the route indicated by the map filed by said company in the Department of the Interior on the third day of January, eighteen hundred and sixty-seven; and upon the construction of each section of said road, in the manner and within the time provided by law, and notice thereof being given by the company to the Secretary of the Interior, he shall direct an examination of each such section by commissioners to be appointed by the President, as provided in the act making a grant of land to said company, approved July twenty-seventh, eighteen hundred and sixty-six, and upon the report of the commissioners to the Secretary of the Interior that such section of said railroad and telegraph line has been constructed as required by law, it shall be the duty of the said Secretary of the Interior to cause patents to be issued to said company for the sections of land coterminous to each constructed section reported on as aforesaid, to the extent and amount granted to said company by the said act of July twenty-seventh, eighteen hundred and sixty-six, expressly saving and reserving all the rights of actual settlers, together with the other conditions and restrictions provided for in the third section of said act."

It will be observed that there is no direct mention of mineral lands, nor any indirect reference to them save such as is involved in the general mention of the "conditions and restrictions" of § 3 of the granting act.

As stated in one of the briefs, the contention is this: "The resolution provided in express terms that these

patents should cover all of the lands coterminous with the constructed sections of the railroad, and in effect provided that the patents should save and reserve the lands excepted by the provisions of section 3 of the original granting act, which included the exception of mineral lands." In other words, it is meant that the resolution required that all the odd-numbered sections within the primary limits of the grant and coterminous with the constructed road should be patented to the railroad company without any inquiry or investigation to determine which of those sections were sold, reserved, occupied by homestead settlers, preëmpted, or otherwise disposed of at the date of definite location, or were mineral, and that a general exception conforming to that in the granting act was to be inserted in the patents. This would mean that lands already sold were to be patented to the company, that reserved lands were to be patented to it, and that lands occupied by homestead settlers or preëmpted were to be dealt with in the same way; in short, that the grant, instead of being administered and adjusted in an orderly way by the officers customarily charged with that duty and in possession of the records and data without which little could be done, was to be administered and adjusted in the courts through the ordinary channels of litigation. Manifestly, that is not what Congress contemplated. It did not intend that the company's title should be so uncertain, and clearly it did not intend that the title to lands already sold or those reserved should be thus beclouded or that homesteaders and preëmptioners should be placed in a situation which would be so embarrassing and discouraging to them. What would become of the indemnity provisions under that theory? Certainly, it was not intended that the company should receive a patent for lands in the place limits and also indemnity for the same lands. We think there is a more reasonable view of the provision in the resolution than the one suggested. Omit-

ting its saving clause, the provision is not materially different from § 4 of the original act, being the section providing for patents. As already said, the chief purpose of the resolution was to sanction a route—the one indicated on the map mentioned. The Secretary of the Interior had disapproved it because not within prior authorization. If it was to be approved it was but reasonable that the existing right to the patents should be applied to it. This evidently is what was intended. Another matter also claimed consideration. Three years had passed since the filing of the map, and in the meantime the situation had been complicated by a withdrawal of the adjacent lands, a revocation of the withdrawal and a suspension of the revoking order. The validity of the route shown on the map and of the withdrawal had been the subject of differing opinions, and some of the lands had come to be occupied by settlers, whose status was uncertain in view of the withdrawal. See 16 Op. A. G. 80. As reported to the Senate by one of its committees, the resolution was in its present form without the saving clause. That was added when the resolution was under consideration.[1] Without it the resolution had two purposes, one to sanction the route which had been pronounced unauthorized, and the other to make secure the right to patents along that route. What was the purpose of the saving clause? Its words and the situation just mentioned leave no doubt that one purpose was to take care of the actual settlers then on the lands. Another, equally plain, was to require that the conditions and restrictions, that is, the exclusions and exceptions, of § 3 (the granting section) of the original act be applied to that route. But how were these purposes to be accomplished? Was it to be by patenting all the lands to the railroad company, even those occupied by

---

[1] Congressional Globe, 41st Cong., 2d Sess., parts 4 and 5, pp. 3349–3351, 3828–3830, 3950–3953.

actual settlers, and inserting saving clauses in the patents? Or was it to be by giving effect to the rights of the settlers and to the exclusions and exceptions in the normal and rational way, that is, by patenting to the company no lands occupied by actual settlers or otherwise excluded or excepted from the grant? The latter seems to us the only admissible conclusion.[1]

Lastly, it is urged that the railroad company accepted the patent with the mineral-land exception therein and also expressly agreed that the latter should be effective as one of the terms of the patent, and so is bound by it or at least estopped to deny its validity. There are insuperable objections to this contention. The terms of the patent whereby the Government transfers its title to public land are not open to negotiation or agreement. The patentee has no voice in the matter. It in no wise depends upon his consent or will. He must abide the action of those whose duty and responsibility are fixed by law. Neither can the land officers enter into any agreement upon the subject. They are not principals but agents of the law, and must heed only its will. *Deffeback v. Hawke*, 115 U. S. 392, 406; *Davis v. Wiebbold*, 139 U. S. 507, 527; *Shaw* v. *Kellogg*, 170 U. S. 312, 337, 343. Nor can they indirectly give effect to what is unauthorized when done directly. Of course, if they enter into any forbidden arrangement whereby public land is transferred to one not entitled to it the patent may be annulled at the suit of the Government, but they cannot alter the effect which the law gives to a patent while it is outstanding.

Taking up the several questions in the light of what we have here said, we answer them as follows:

1. Did the said grant to the Southern Pacific Railroad Company include mineral lands which were known to

---

[1] See *Tome* v. *Southern Pacific R. R. Co.*, 5 Copp's L. O. 85; *Southern Pacific R. R. Co.* v. *Rahall*, 3 L. D. 321.

be such at or prior to the date of the patent of July 10, 1894?

Answer.—Mineral lands, known to be such at or prior to the issue of patent, were not included in the grant but excluded from it, and the duty of determining the character of the lands was cast primarily on the Land Department, which was charged with the issue of patents.

2. Does a patent to a railroad company under a grant which excludes mineral lands, as in the present case, but which is issued without any investigation upon the part of the officers of the Land Office or of the Department of the Interior as to the quality of the land, whether agricultural or mineral, and without hearing upon or determination of the quality of the lands, operate to convey lands which are thereafter ascertained to be mineral?

Answer.—A patent issued in such circumstances is irregularly issued, undoubtedly so, but as it is the act of a legally constituted tribunal and is done within its jurisdiction, it is not void and therefore passes the title (*Noble* v. *Union River Logging Railroad*, 147 U. S. 165, 174–175), subject to the right of the Government to attack the patent by a direct suit for its annulment if the land was known to be mineral when the patent issued. *McLaughlin* v. *United States*, 107 U. S. 526; *Western Pacific Railroad Co.* v. *United States*, 108 U. S. 510.

3. Is the reservation and exception contained in the grant in the patent to the Southern Pacific Railroad Company void and of no effect?

Answer.—The mineral land exception in the patent is void.

4. If the reservation of mineral lands as expressed in the patent is void, then is the patent, upon a collateral attack, a conclusive and official declaration that the land is agricultural and that all the requirements preliminary to the issuance of the patent have been complied with?

Answer.—It is conclusive upon a collateral attack.

5. Is petroleum or mineral oil within the meaning of the term "mineral" as it was used in said acts of Congress reserving mineral land from the railroad land grants?

Answer.—Petroleum lands are mineral lands within the meaning of that term in railroad land grants.

6. Does the fact that the appellant was not in privity with the Government in any respect at the time when the patent was issued to the railroad company prevent him from attacking the patent on the ground of fraud, error or irregularity in the issuance thereof as so alleged in the bill?

Answer.—It does.

7. If the mineral exception clause was inserted in the patent with the consent of the defendant, Southern Pacific Railroad Company, and under an understanding and agreement between it and the officers of the Interior Department that said clause should be effective to keep in the United States title to such of the lands described in the patent as were in fact mineral, are the defendants, Southern Pacific Railroad Company and the Kern Trading and Oil Company, estopped to deny the validity of said clause?

Answer.—No; such an agreement is of no greater force as an estoppel than the exception in the patent. The latter being void, the patent passes the title and is not open to collateral attack or to attack by strangers whose only claim was initiated after the issue of the patent.