## THOMPSON et al. v. BALTIMORE & O. R. CO. et al.

### No. 13129.

Circuit Court of Appeals, Eighth Circuit.

June 10, 1946.

Rehearing Denied July 26, 1946.

---

M. G. Roberts and H. H. Larimore, both of St. Louis, Mo. (B. F. Batts and S. G. Ray, both of St. Louis, Mo., on the brief), for appellants.

Douglas F. Smith, of Chicago, Ill. (Kenneth F. Burgess and Robert A. Sprecher, both of Chicago, Ill., Wilton D. Chapman and E. C. Hartman, both of St. Louis, Mo., George C. Doering, of Baltimore, Md., Thomas P. Healy, of New York City, Guernsey Orcutt, of Philadelphia, Pa., and Sidley, Austin, Burgess & Harper, of Chicago, Ill., on the brief), for appellees.

Before SANBORN, WOODROUGH, and THOMAS, Circuit Judges.

THOMAS, Circuit Judge.

This is an action brought by the appellants for a declaratory judgment under § 274d of the Judicial Code, 28 U.S.C.A. § 400, and for an injunction. The defendants answered denying the claims of plaintiffs but praying also for a declaratory judgment and for an injunction. The pleadings and briefs present the two sides of a controversy of several years standing. The trial court denied plaintiffs' petition and granted the relief demanded by the defendants. The court's opinion is reported in 59 F.Supp. 21.

The plaintiffs separately own and operate railroad systems in Southwestern Freight Bureau Territory which, for the most part, lies west of the Mississippi river and includes parts of New Mexico, Louisiana and Missouri and all of Arkansas, Oklahoma and Texas. The defendants operate railroads in Central Freight Association and Trunk Line Territory which with New England Territory is called Official Classification Territory. Official Territory lies generally east of the Mississippi river and north of the Ohio river and of a line running in an easterly direction from Huntington, West Virginia, to Norfolk, Virginia. The lines of the plaintiffs, herein called Southwestern Lines, and the lines of the defendants, called Eastern Lines, connect at such gateway cities as St. Louis and Cairo.

The controversy between plaintiffs and defendants involves the division of revenues received from the government of the

United States for transporting military and naval supplies from points in one territory through one of the gateways to points in the other, including movements both east and west.

The division of revenues arising from joint transportation of commodities for the public is not involved in this case. For several years a dispute as to the division of such revenues existed between plaintiffs and defendants and many other railroads operating in Official and Southwestern Territories. In a proceeding before the Interstate Commerce Commission the dispute was settled by a final order of the Commission entered July 25, 1939, which order provided:

"That the complainants and defendants in said proceedings, according as they participate in the transportation, be, and they are hereby notified and required to establish on or before March 1, 1940 [changed to April 1, 1940], and thereafter apply divisions of joint all-rail interstate rates between official classification territory and southwestern territory, * * *"

As a result of this order, and for the convenience of their accountants, representatives of all the railroads subject to the order published Joint Division Sheet No. 200-A. In it are set out the factors and percentages to be applied in determining the divisions between the carriers of revenues derived from transporting joint traffic for the public between the two territories.

In certain cases the United States does not pay as high rates for transporting military and naval supplies as the railroads charge the public for equivalent services. This difference in favor of the government is due to the fact that at the time railroads were building from the eastern across the western states the government granted land to many of them to aid in the construction of their lines. These grants were not gifts, but in consideration of such grants the railroads receiving them were obligated to haul property for the United States at reduced rates. Burke v. Southern Pacific R. Co., 234 U.S. 669, 679, 34 S.Ct. 907, 58 L.Ed. 1527. At the present time the United States is not required to pay in excess of 50% of the lowest rate paid by the public for transportation of government property over "land grant mileage." 10 U.S.C.A. § 1375. In both the Official and Southwestern territories are many railroad lines to which the reduced land grant rates do not apply. Some of such routes are more direct and convenient for the government's use than are the available land grant routes.

For the purpose of securing a part of the government business the plaintiffs and the defendants and many other railroads, acting pursuant to the authority of § 22 of the Interstate Commerce Act, 49 U.S.C.A. § 22, have entered into "freight land grant equalization agreements" with the War Department. In these contracts the carriers agree "to accept for the transportation of property shipped for account of the Government of the United States and for which the Government of the United States is lawfully entitled to reduced rates over land-grant roads, and lowest net rates lawfully available, as derived through deductions account of land-grant distances from lawful rates filed with the Interstate Commerce Commission * * * applying from point of origin to destination at time of movement." These contracts are entered into voluntarily by the railroads; and they may, in so far as the government is concerned, contain such conditions, restrictions and limitations as the railroads filing them desire to impose.

In practice the route over which "the lowest net rates lawfully available, as derived through deductions account of land grant distances from lawful rates", is called the governing route. The route over which the traffic moves under the equalization agreements is called the competing or equalizing route. When traffic is carried over an equalizing route the charge to the government is a single charge and is equal to the net rate over the governing route.

In cases of joint transportation it has long been the custom for the delivering carrier to collect the freight charges and to apportion them among the participating lines. Since April 1, 1940, the effective date of Joint Division Sheet No. 200-A, divisions of revenues derived from trans-

portation of commodities for the public have been made by the plaintiffs and defendants without controversy on the basis of the percentages established therein, that is, by the formula prescribed by the Interstate Commerce Commission in its order of July 25, 1939, "according as they [the joint carriers] participate in the transportation." Since about 1934 the plaintiffs began, also, to divide and distribute the revenues on joint traffic carried for the government by applying the same formula. This is known as the prorate formula.

When a shipment for the government originates on plaintiffs' lines and is delivered over the defendants' lines the defendants collect and divide the revenues on the territorial basis, that is, they first ascertain the share each of the participating carriers would receive if the shipment were carried for the public by applying the commercial divisions of Joint Division Sheet No. 200-A. From the share of the eastern line so determined the deductions are made for land grant mileage on the governing route in Official territory and from the share of the southwestern line so determined the deductions for land grant mileage on the governing route in territory outside of Official territory.

It so happens that there are more land grant deductions available to the government in Southwestern territory than there are in Central or Official territory. This is true whether traffic moves over the governing route, or the equalizing (or competing) route. The territorial basis of division will, therefore, in most cases give to the defendants a larger and to the plaintiffs a smaller percentage of the revenues derived from government traffic than does the prorate method. The dispute between the parties over which of these methods, the territorial or the prorate, is the proper method to apply to revenues arising from government traffic moving over equalizing routes presents the question involved in this case. The question is complicated by the fact that each of the defendants filed new freight land grant equalization agreements with the War Department in 1943, effective January 1, 1944. In each of these agreements the following restriction was incorporated:

"3(d) The participation of this carrier in rates derived through land grant deductions is subject to the limitation that this carrier will participate only in deductions for the land-grant mileages within Central Freight Association territory of the lines of railroad in the southern peninsula of Michigan and of the Illinois Central within Illinois between Chicago and Cairo and between Minonk and Centralia, both inclusive."

In this action the plaintiffs demand in substance that the court declare

1. That land grant rates over equalizing routes are "joint rates" within the meaning of Joint Division Sheet No. 200-A;

2. That Joint Division Sheet No. 200-A is a contract between plaintiffs and defendants controlling the division of revenues derived from the joint transportation of government property by the parties over equalizing routes; and

3. That the defendants' restriction, 3 (d), supra, to their equalizing agreements effective January 1, 1944, constitutes a divisional formula and is not a contract binding on plaintiffs because they are not parties thereto.

The plaintiffs demand further that the court enjoin the defendants from applying the territorial formula to the division and settlement of land grant revenues earned by the parties and collected by the defendants.

The defendants deny each of the contentions of the plaintiffs and ask that the rights of the parties be declared accordingly and that plaintiffs be enjoined from settling with defendants for land grant revenues collected by plaintiffs by deducting any sums other than those assumed by defendants as limited in sub-paragraph 3 (d) of their equalization agreements, supra.

The court, contrary to the contention of plaintiffs, held that net land grant rates are not joint rates within the meaning of that term as used in Joint Division Sheet No. 200-A, and that Division Sheet No. 200-A is not a contract between the parties controlling the division of revenues derived from joint transportation of government property over equalizing routes.

■ The court found that the representatives of the plaintiffs and of the defendants who participated in the issuance of the division sheet had no authority to enter into a contract to allocate or apportion revenues accruing from the shipment of government freight subject to land grant deductions; that they did not intend to enter into such a contract; nor did any of plaintiffs or defendants ever construe or interpret the Division Sheet to be such a contract; and that the term "joint rates," as used by the parties in Sheet No. 200-A, applies only to commercial rates charged the public and which are subject to the jurisdiction of the Interstate Commerce Commission.

These findings support the decree denying the relief demanded by the plaintiffs and they are abundantly sustained by the evidence. The testimony is voluminous. To review it here would unduly extend this opinion. Further, such a review is unnecessary because the trial court has set it out at length in its opinion.

■ In connection with the findings as to the non-contractual nature of Division Sheet No. 200A, the plaintiffs contend that the court erred in admitting in evidence, over timely objection, the testimony of the representatives of the defendants participating in the conference which formulated the Division Sheet that it was not their intention to include therein revenues arising from the transportation of property of the United States. The rule, however, is that, in a case tried to the court without a jury, the admission of incompetent evidence does not render the findings erroneous where there is substantial competent evidence to support them. "The presumption is that the trial court considered only the competent evidence and disregarded all evidence which was incompetent." Thompson v. Carley, 8 Cir., 140 F.2d 656, 660, and cases cited. Here the findings of the court are abundantly supported by competent evidence. In the proceedings culminating in the issuance of the Division Sheet the parties did not consider land grant rates. That Division Sheet was issued "as a result of opinion and order of the Interstate Commerce Commission" of July 25, 1939. The Commission had no jurisdiction over land grant rates and was without power to make any order or to give any direction concerning them. In the conference the parties did not consider such rates. Only commercial rates were dealt with, and none other.

While we conclude that the court rightly denied to the plaintiffs the relief demanded in their petition, we are also of the opinion that it exceeded its jurisdiction in granting to the defendants the injunctive relief demanded by them.

■ In Terminal R. R. Association et al. v. United States et. al., 266 U.S. 17, 30, 45 S.Ct. 5, 8, 69 L.Ed. 150, the Supreme Court said: "The making of rates is a legislative and not a judicial function (citations). The division of joint rates is also legislative in character." See, also, Watab Paper Co. v. Northern Pac. Ry. Co., 8 Cir., 154 F.2d 436, 438. The Interstate Commerce Commission is authorized to establish through routes and to fix joint commercial rates and to fix divisions of such rates among carriers. 49 U.S.C.A. § 15(1), (3) (6). But the Congress has not delegated either to the Commission or to the courts power to fix divisions of net land grant rates over equalizing routes. Such divisions can be fixed only by contracts among the participating carriers. These divisions can not be determined by reference to any order of the Commission or of the War Department or of the court; and it is conceded by the parties and it was recognized by the court that equalizing, or land grant, agreements do not include contracts between the carriers. The court in its opinion said [59 F.Supp. 31]:

"Land grant agreements are contracts between the individual carrier and the Government. They are purely voluntary and subject to such terms only as the contracting parties agree upon. Plaintiffs have no lawful right to control in any manner defendants' land grant agreements with the Government. Defendants have no lawful right to control in any manner plaintiffs' land grant agreements with the Government. They are subject to cancellation by the parties to them without interference from any other carrier."

■ Neither can one carrier by inserting conditions and restrictions in its equalizing land grant contract with the government make such restrictions binding upon another carrier without the other carrier's consent.

Notwithstanding these conceded propositions, the defendants, without any contract with plaintiffs covering divisions of land grant rates, inserted in their equalizing agreements effective January 1, 1944, restrictive condition 3(d) quoted supra, and the decree "perpetually" enjoins plaintiffs "from deducting from the sums payable to defendants any land grant deductions other than those specifically assumed by defendants in their respective equalization agreements", as limited of course by clause 3(d). The decree, also, in amplification of or in addition to the injunctive provision, contains the following mandatory order:

"On all shipments of Government traffic, subject to land grant deductions, involved in this cause where the plaintiffs are the terminating and settling lines they shall settle with and remit to defendants in payment for defendants' services in the transportation of such traffic on the following basis:

"(1) Ascertain the amount which the defendant handling the shipment would receive for like transportation performed for the public at large by dividing the through rate according to the commercial division basis, then (2) reduce the separate commercial proportions thus ascertained, by the land grant deductions accruing in Central Freight Association Territory and assumed by such defendant in its equalization agreement with the Government, and (3) remit such reduced sum to the defendant concerned."

The decree thus imposed upon the plaintiffs without their consent the territorial formula for division of land grant rates. It applies to the future and provides that plaintiffs "shall settle * * * with defendants" hereafter on the basis set out. The decree, if valid, accomplishes what can legally be effected only by a contract between the parties. It is a legislative, not a judicial, act. The decree does not purport to apply to completed transactions.

It could not do so. This is not a suit for an accounting; no evidence was introduced on that theory. The equitable principles of accounting are not applicable.

The decree declares "That on all land grant traffic involved in this cause defendants are obligated to bear only the land grant deductions arising out of land grant mileage in Central Freight Association Territory and described in their respective equalization agreements, * * *"

The error in this declaration is apparent when it is observed that the United States, with which the defendants' equalization agreements were made, is not a party to this suit. Further, in their equalization agreements the defendants agreed, "subject to the conditions and exceptions below, to accept, for the transportation of property shipped for account of the Government * * * the lowest net rates lawfully available, as derived through deductions account of land-grant distance from lawful rates * * * from point of origin to destination at time of movement."

By exception 3(d), supra, defendants limit their participation in deductions to land grant mileages within Central Freight Association Territory.

■ Clearly, it seems to us, the Agreement read as a whole means that defendants will accept and receive shipments for the government at the lowest net rates available, but that for through traffic over connecting lines from or to points outside of Central Freight Association Territory they will divide the revenues only on the territorial basis. The decree makes this divisional formula binding upon the plaintiffs who are not parties to it. Thus a contract is imposed upon plaintiffs to which they have not consented. In so doing the power exercised by the court is no different from the power to prescribe divisions, which is not a judicial but is a legislative power. A court can not by declaratory judgment make contracts for parties before it or prescribe division of rates on through traffic over connecting lines of railroad. Divisions of land grant rates to be earned in the future can be settled only by contract between the participating carriers. Division of revenues so earned in

the past can be settled only by agreement or by a proper suit in equity. No basis for determining a proper division of such past earnings by the parties to this suit is either pleaded or proven in this case.

The decree appealed from is modified by eliminating therefrom the declaratory and injunctive relief granted the defendants and as so modified is affirmed. The costs in this court will be taxed in equal parts to the plaintiffs and to the defendants.