80 F.Supp. 570 (1948)
BALTIMORE & O. R. CO. et al.
v.
THOMPSON et al.
No. 4999.
District Court, E. D. Missouri, E. D.
September 28, 1948.
*571 *572 Douglas F. Smith, Kenneth F. Burgess, and Richard F. Babcock, all of Chicago, Ill., Edwin H. Burgess, of Baltimore, Md., Martin Lucente, of Chicago, Ill., Thomas P. Healy, of New York City; Guernsey Orcutt, of Philadelphia, Pa., and Wilton D. Chapman and F. W. Schwarz, both of St. Louis, Mo., for plaintiffs.
M. G. Roberts, S. G. Ray, and John E. McCullough, all of St. Louis, Mo., for defendant St. Louis-San Francisco Ry. Co.
Thos. T. Railey and Toll R. Ware, both of St. Louis, Mo., for Guy A. Thompson, trustee of Missouri Pacific Lines named as defendants.
John W. Murphy and Clyde W. Fiddes, both of St. Louis, Mo., for defendants St. Louis Southwestern Ry. Co. and St. Louis Southwestern Ry. Co. of Texas.
HULEN, District Judge.
Two suits involving the same subject matter have been before this Court  this is the second. In the original action between the same parties, but in reversed position, the Court of Appeals denied defendants (in this case) a declaratory judgment that a Division Sheet, known as 200-A, constituted a contract between plaintiffs and defendants prescribing the method for division of land grant revenues received by them, respectively, from the Government under equalization agreements on Government traffic between the two freight territories served by them. Mandatory injunction directing settlement on future land grant revenue collections according to their respective claims was sought by each of the parties. The Court of Appeals ruled this Court was without jurisdiction to prescribe divisions on future land grant revenue absent a contract between the parties. 8 Cir., 155 F.2d 767.
The statute under which land grant revenues accrued to railroads has been repealed. Public Law 256, 79th Congress, effective October, 1946, 59 Stat. 606, 49 U.S.C.A. § 65. By this action plaintiffs seek equitable relief against defendants; i. e., an accounting on land grant revenues collected by defendants on which defendants have failed to settle or account to plaintiffs according to plaintiffs' claim of proper division, namely the territorial division plan. Defendants by counterclaim ask for like relief against plaintiffs but on a different theory, or the pro-rate method of settlement. Although joined in one complaint and separate answers, the claims of all parties are several. The claims and counterclaims involve like question of law and fact and their joinder is authorized under Federal Rules of Civil Procedure, 28 U.S.C.A.
Plaintiff roads operate in Official Territory; defendants in Southwestern Territory. Generally speaking the Mississippi River is the dividing line. By "Supplement" to the amended complaint plaintiffs *573 fix the time "beginning fall of 1934" and movement involved under the complaint 
"* * * all Government land grant freight traffic transported from stations in Official Territory to stations of defendants and their subsidiary companies in Southwestern Territory, (1) which receives its rail transportation in or through Central Freight Association Territory, solely from one or more of the plaintiffs, (2) is delivered by one of the plaintiffs to any defendant at Cairo, East St. Louis, Flinton, Gale, Kellogg, Metropolis or Thebes, all in the State of Illinois, or at St. Louis, Missouri, (3) which receives its rail transportation in Southwestern Territory solely from one or more of the defendants or their subsidiary companies, and (4) is delivered by one of the defendants or any said subsidiary company to the consignee at destination."
The counterclaims generally describe the same traffic, with varying "time" as we shall refer to later, except the movement is east with delivery to plaintiffs at same gateways.
Each defendant, by separate count, seeks recovery of sums paid plaintiffs under injunctive order of trial court, which order was subsequently set aside on appeal. Decision of the main case will determine all issues presented.
Plaintiffs unite in stating their position as follows:
"The plaintiffs and each of them, own and are legally and equitably entitled to receive from each defendant in respect to every shipment of which such defendant is the delivering and settling road, a just and equitable share or part of the net land grant rate paid by the Government on each said shipment of the traffic described in paragraph 7 hereof, and such part is a sum equal to the amount which plaintiffs would receive for like transportation performed for the public at large, reduced only by the deductions on account of land grant mileage located in Central Freight Association Territory equalized by the respective [plaintiff] roads, and all such unpaid sums are held in trust for the several plaintiffs by the respective defendants."
Defendants join in a position to support their respective counterclaims and meet the claims of plaintiffs. While stated in the various pleadings of the defendants in different words, we select the following from brief of Guy A. Thompson, Trustee, as summarizing their contention and answer to plaintiffs' claim:
"1. The traffic involved is interterritorial; it moved over equalizing (competing) routes, as distinguished from land-grant routes, which came into being by virtue of equalization agreements filed by each of the parties to this cause.
"2. The equalization agreements were rate-making agreements; their object was to divert through shipments to the non-land-grant route; the only relation that `land-grant' has with this case is to measure a rate, not to divide a rate.
"3. The competition of each participating carrier was with the land-grant route from origin to final destination of each shipment.
"4. There are no land-grant deductions over the equalizing routes; the parties to this cause agreed to protect the lowest net rate lawfully available,  a single-factor through rate.
"5. The measure of the carrier's participation in the joint transportation service is the measure of its divisions of the joint transportation charges.
"6. The just and equitable shares for the amount and kind of transportation performed by the parties to this cause have been determined by the Interstate Commerce Commission."
Under plaintiffs' claim of proper settlement each defendant is indebted to each plaintiff, and under defendants' counterclaims each plaintiff is indebted to each defendant.
The issues thus formed constitute the theory on which the case was tried. By brief one defendant now urges dismissal on a law point, and defendant Frisco of Texas (St. Louis, San Francisco and Texas Railway Company) challenges the jurisdiction of the Court on ground of improper venue. In reverse order we consider these issues. Facts set forth in opinion of Court *574 of Appeals in first case need not be repeated. See 8 Cir., 155 F.2d 767.

I.
Jurisdiction is based on diversity of citizenship of the parties. Under Section 51 of Judicial Code, U.S.C.A., Title 28, Sec. 112[1], this character of suit can be maintained only in the district of residence of either plaintiff or defendant. A corporation is a resident of the State under the laws of which it is incorporated. Suttle v. Reich Bros. Construction Company et al., 333 U.S. 163, 68 S.Ct. 587.[2] It is conceded defendant Frisco of Texas is organized under the laws of the State of Texas. The complaint alleged, as a ground of venue, it was "doing business within the Eastern Judicial District of Missouri." No evidence was offered that proves it. Whether such charge, if proven, would give venue to this Court is therefore moot. We do not pass on it.
Plaintiffs urge that the answer and counterclaim filed by Frisco of Texas waived venue. If the counterclaim is compulsory there was no waiver; if permissive there was a waiver. Defendant's answer labeled its counterclaim "permissive." The Federal Rules of Civil Procedure determine its character; not the assumption of the pleader. See Rule 13(a), Federal Rules of Civil Procedure. The test  did the counterclaim of Frisco of Texas arise out of "the subject matter of the opposing party's claim * * *"? Plaintiffs are seeking an accounting only on shipment from east to west, and so far as Frisco of Texas is concerned only on shipments for which it was the settling carrier. Frisco of Texas by its counterclaim would have each plaintiff account to it only on shipments traveling east which passed over its line in Texas and which had their destination on one of plaintiff lines and for which one of the plaintiffs was the settling line. The shipments, revenue from which plaintiffs are asking for an accounting, are not the same as those for which Frisco of Texas seeks an accounting. This far we agree with plaintiffs. No further. The subject matter of this suit is division of revenue on shipments under land grant equalization agreements. Whether the shipments travel east or west, they travel, with respect to the various roads of the parties, under the same land grant agreements of those carriers. This action will determine how all such revenue shall be divided under the individual agreements. The counterclaim of Frisco of Texas is based on traffic that moved east under its land grant agreement, and the claim of plaintiffs against it, while founded on their individual agreements, yet the traffic in so far as Frisco of Texas is concerned moved under its agreement when it reached its line, and that agreement is the heart of its defense. The question is close, but we are unable to escape the conclusion the subject matter of the defendant's counterclaim is so closely interwoven with that of plaintiffs' claim that they both arise out of the same transaction, namely transportation of Government traffic under the equalization agreements of the parties and proper division of land grant revenues received under them.
Defendant timely raised the question of venue. We deferred ruling on plaintiffs' representation that the defendant did business in Missouri and that plaintiffs' cause of action was founded on such business. This claim plaintiffs did not establish. We think if the question be doubtful it should be resolved in this defendant's favor because it was compelled to act in filing its counterclaim.
The finding of fact and conclusions of law will be accordingly as to the Frisco of Texas with a judgment of dismissal for lack of jurisdiction because of improper venue.
Section 1406, Title 28 U.S.C.A. (Amended Code, effective September 1, 1948), is not retroactive in our opinion and does not control disposition of the cause.

II.
The Frisco (St. Louis Southwestern Railway Company) urges by brief dismissal under decision in the original case. The Frisco's position is that land grant revenues under equalization agreements are joint rates and this Court is without *575 power to prescribe a basis of division because this is "a legislative and not a judicial function." Concluding presentation of the point this defendant's brief states:
"In spite of the decision of the Court of Appeals in the prior case, plaintiffs in the pending action are again asking this court to apply the territorial basis. Their request is barred by the law of this case."
If the decision of the appellate court were open to the construction placed on it by defendant our work would be ended. We propose to follow the mandate of that Court.
In the first case plaintiffs (defendants here) sought a declaratory judgment that a certain division sheet constituted an agreement with plaintiff carriers for division of land grant revenues on the pro-rate basis. In that case the defendants (plaintiffs here) applied for a ruling that the territorial basis was the proper method of division of land grant revenues. Plaintiffs and defendants in that action were each striving for a judgment that would control divisions of future land grant revenues only. This Court gave one in defendants' (plaintiffs here) favor. As to such future revenues and power of the Court to adjudicate their proper division the higher Court's ruling was [155 F.2d 772]:
"The decree thus imposed upon the plaintiffs without their consent the territorial formula for division of land grant rates. It applies to the future and provides that plaintiffs `shall settle * * * with defendants' hereafter on the basis set out. The decree, if valid, accomplishes what can legally be effected only by a contract between the parties. It is a legislative, not a judicial, act. The decree does not purport to apply to completed transactions. It could not do so. This is not a suit for an accounting; no evidence was introduced on that theory. The equitable principles of accounting are not applicable."
No party to the first case, by pleading or otherwise, asked for accounting. No evidence was offered to support a claim respecting revenues that had been collected by either party up to time the first action was filed. The present action is concerned wholly with division of revenues collected by the parties prior to institution of this suit. Can a case for equitable relief be maintained for accounting of such money received and held by the respective parties if they have failed to make proper settlement? The Court of Appeals said:
"Division of revenues so earned in the past can be settled only by agreement or by a proper suit in equity." (Emphasis added.)
Manifestly the parties cannot agree on a division. Words could not be used to state more emphatically the right of the carriers to maintain this action as a matter of law. Defendants assert, the ruling quoted is "sheer obiter." Of course a ruling could have been made absent the language quoted but full discussion of the issues called for the observation. It has been observed that "obiter" is that part of an opinion with which one does not agree. We need not pursue the matter because we are convinced that the Court's ruling, whether or not "sheer obiter," correctly states the law on the present question. See Great Northern R. Co. v. Merchants Elev. Co., 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943; Atlantic Coast Line R. Co. v. Pennsylvania R. Co., D. C., 12 F.Supp. 720; Backus-Brooks Co. v. Northern Pac. R. Co., 8 Cir., 21 F.2d 4. Directly to the point is the case of Morgenthau v. Sugar Land R. Co., 5 Cir., 83 F.2d 72, 74:
"The jurisdiction invoked is that of a court of equity to enforce a fair account from one who has received money for another, or one who has engaged in a joint enterprise with another and collected more than his share of the profits. We see no reason why the principles of equity used in such a situation, or used at law in an action for money had and received, may not be applied to two common carriers, except so far as statute may prevent."
Fixing of land grant revenue divisions for past, not future transaction has not been assigned to any department of the Government outside the courts. Defendants have pointed to no statute prohibiting courts from exercising jurisdiction in equity to decree proper division of land grant revenues collected and held subject *576 to proper division. There is no reason we know of why a dispute as to their division should not be justiciable, the same as any other private controversy. Plaintiffs' case is based on the rule of law that any money had and held by the defendants, which should have been paid or accounted for to plaintiffs, had the territorial method of settlement been followed by defendants, was wrongfully withheld and is now held in trust by the defendants, a constructive trust, since it arises by operation of law acting on the conduct of the defendants and not by agreement between the parties. Defendants, where they were the collecting or settling carriers, collected the revenue due all parties to the carriage, including plaintiffs. Defendants were bound to account to plaintiffs for such sum of money as was legally and equitably due plaintiffs and was collected by defendants. If defendants have failed to account for the sum justly and equitably due plaintiffs they are subject to equitable jurisdiction of the courts to compel accounting of the sums thus due and owing to plaintiffs. The same rule of law applies to the counterclaims of the defendants and for the same reason. 3 Bogert on Trusts and Trustees, § 471; Restatement of Restitution, Sec. 160. In Atlantic Coast Line R. Co. v. Pennsylvania R. Co., supra, 12 F.Supp. loc. cit. 722, 723, the Court states what we believe to be the applicable rule of law:
"* * * What the court is asked to do is to determine how much of a sum of money received by a trustee belongs to his cestui que trustent. This it finds independently of the source from which derived. This particular fund happened to come from freight carriage receipts. If it had any other origin, the jurisdiction of the court would have been the same. Hence the source is unimportant. What the courts decide is not what is a fair and just division of joint through rates among participating carriers, but what is the fair share of the plaintiff in a sum of money received by the defendant for services rendered by both. This remains true notwithstanding that it is also true that the two may happen to be the same. This indicates that the bill will lie."

III.
The issues on the merits of the controversy are not as broad or intricate as the volume of evidence and exhibits indicate. No defendant questions the correctness of plaintiffs' position that the territorial method of division of land grant revenue received by virtue of equalization agreements with the Government prior to filing by plaintiffs with the Government of new equalization agreements in 1934 was just and equitable. One defendant apparently concedes the correctness of plaintiffs' position as to such revenues collected on such shipments as late as 1939. Another did not question it until 1942. The defense to plaintiffs' case, of all defendants, is based on the meaning of agreements of plaintiffs. It may be stated as follows:
"Prior to 1934, plaintiffs' equalization agreements contained various restrictions and limitations of the land grant mileage equalized by them. These restricted agreements, by equalizing only specified portions of land grant mileage, foreclosed plaintiffs from participating fully in the transportation of Government traffic. In 1934, or thereabouts, plaintiffs, for the purpose of participating fully in the carriage of Government traffic over all routes, removed the aforesaid restrictions and limitations from their equalization agreements, and thereby joined with these defendants in creating the interterritorial equalization routes to which the traffic involved in this suit was diverted from the competitive land grant routes. In respect of each such equalization route, plaintiffs, in order to meet the competition of all carriers comprising the land grant route, joined with defendants in making available to the Government a single-factor rate equal to the land grant rate available over the competitive land grant route. This single-factor rate in each instance equalized all deductions for land grant mileage on the governing land grant route in both Central Freight Association and Southwestern Territories. Every equalization route over which the traffic here involved moved was a joint route so created for the purpose of attracting traffic from the lines of other railroads comprising the governing land grant route. *577 The freight charges paid and collected for transportation over these equalization routes were in all instances joint revenue for transportation jointly performed by the two or more railroads participating in the movements." Joint and Several Answer, and Counterclaims, of Guy A. Thompson, Trustee, etc., to the Amended Complaint as Supplemented, pp. 2, 3. (Emphasis by Court)
The intention of the plaintiffs, the clear meaning and legal effect of plaintiffs' 1934 equalization agreements determine this main issue. Plaintiffs introduced a mass of exhibits and considerable testimony on the subject. To arrive at the purpose and intention of plaintiffs, as to division and absorption of land grant as between the parties, in executing with the Government new equalization agreements in 1934, we will not review this evidence in detail. A summary demonstrates plaintiffs' purpose and intention.
Land grant equalization agreements were made under the provisions of Section 22, Interstate Commerce Act, 49 U.S.C.A., Sec. 22, to meet competition created by the land grant statute, 43 Stat. 486, 10 U.S.C.A. § 1375.[3] The latter statute created a competitive disability for all railroads having no land grant mileage, if its lines were located so it had to compete with railroads having land grant mileage. To meet this competition, proceeding under Section 22, non-land grant roads nearly half a century ago started making agreements with the Government. These agreements are between the individual carrier and the Government; never between carriers. Each carrier fixes the terms as to what land grant mileage it will equalize. Plaintiffs confined their equalization in all cases to "C.F.A." (Central Freight Association) Territory, and defendants (with some exceptions) to Southwestern Territory. Plaintiff roads operate only in "C.F.A." Territory  sometimes referred to as Official Territory. Generally it includes States east of the Mississippi River and north of the Ohio River. Defendants operate in what is called Southwestern Territory. Generally this includes territory west of the Mississippi River, the States of Texas, Oklahoma, Arkansas, Louisiana and southern part of Missouri. Lines of the different plaintiffs compete with each other, as well as some other lines not parties to this case in "C.F.A." Territory. The same is true of defendants, but in Southwestern Territory. Plaintiff lines are not situated geographically as to compete with either of the defendant lines in Southwest Territory.
Land grant equalization agreements came into use in "C.F.A." Territory over thirty years ago. The history of such agreements in "C.F.A." Territory shows a gradual development in scope, all within "C.F.A." Territory prior to 1934. There have been many agreements filed by the plaintiffs through the years. These resulted solely from a desire of the plaintiffs to extend or withdraw equalization to some competing line in "C.F.A." Territory. This conclusion, prior to 1934, we do not understand defendants to dispute. These numerous agreements with changes and counterchanges brought constant reactions from the Government. The Government complained, the numerous equalization agreements on file as to "C.F.A." Territory made by the plaintiffs were so complicated that it was difficult to tell just what land grant mileage in "C.F.A." Territory the respective carriers were equalizing and resulted in difficulty on the part of the Government to determine the most economical route for Government freight. For this reason the Government, with increasing pressure, was "suggesting" to plaintiffs the *578 elimination of all restrictions within "C.F. A." Territory in their agreements. Take one or two cases for illustration. Prior to 1932 neither plaintiff attempted to compete with any land grant mileage of the Illinois Central South of Kankakee through Chicago, and "some" land grant mileage in Michigan. In 1932 all plaintiffs executed new equalization agreements with the Government to equalize the land grant of the Illinois Central to Gilman "only," South of Kankakee. Next one of the plaintiffs agreed to equalize to Gilman on the Illinois Central. Each step in changing equalization agreements by the plaintiffs was caused by a decision by the individual carrier to meet some specific competition in "C.F.A." Territory. For example the action of the Pennsylvania in equalizing to Gilman resulted from the Nickel Plate road operating in "C.F.A." Territory executing such an agreement some two years prior to the action of the Pennsylvania. The action of the Nickel Plate made it competitively possible for it to obtain traffic from the East to East St. Louis, thus diverting traffic that had gone by way of Chicago, also diverting such traffic from the Pennsylvania. The action of the Pennsylvania caused the New York Central to take like action as soon as they felt the competitive effect of the Pennsylvania's action. Without going further into the expansive web of equalization agreements of plaintiffs and "C.F.A." carriers, we pass to the period just prior to execution of the 1934 agreements. Prior to 1934 neither of the plaintiffs equalized the Illinois Central land grant mileage to Cairo, Illinois. As long as neither of the plaintiffs did so there was no competitive advantage or disadvantage to either of the plaintiffs, but other carriers operating in "C.F. A." Territory had executed equalization agreements to equalize to Cairo. During this period (prior to 1934) Government traffic increased and commercial traffic decreased. This resulted in plaintiffs and other "C.F.A." roads competitive to each other looking more seriously to Government traffic. Equalization agreements and land grant track in "C.F.A." Territory took on an increased importance. Roads having such track or agreements claimed the Government traffic on which there was a substantial increase in volume. Meantime the Government had continued its insistence on the "C.F.A." roads, particularly the plaintiffs, to equalize not only all Illinois Central land grant but all land grant in "C.F.A." Territory. This would simplify the work of the Government in routing and open more routes to them in "C.F.A." Territory. This combination of circumstances  but with competitive reasons appearing as the moving cause  brought the matter to a head in 1934 when the Nickel Plate, a "C.F.A." carrier, signed an equalization agreement by the terms of which it met competition of all land grant in Central Freight Association Territory. The other "C.F.A." roads had no choice if they were to compete in their territory with the Nickel Plate for Government business. The Pennsylvania and Baltimore & Ohio made their new agreements in September, 1934. The New York Central in October of the same year. By them they equalized all land grant mileage in "C.F.A." Territory. These agreements constitute the crux of this case.
Evidence on this phase of the case includes innumerable communications between the plaintiff carriers. There are inter-departmental communications; there are communications to and from the department of the Government in charge of land grant equalization agreements. The salient feature of this part of the record, important in view of the position of the defendants, is that we find no reference in it prior to 1934 of alleged competition with any defendant line by anyone. The parties, both carriers and the Government, were solely concerned with competition with lines within Central Freight Association Territory. This was because it was those roads and those roads only that plaintiffs had to consider in losing or obtaining land grant traffic in "C.F.A." Territory. Further it must be said, we are unable to find in the record any evidence of consultation or correspondence with any one of the defendants over the entire period, up to and including execution of the 1934 agreements by plaintiffs, on the subject of the agreements and their effect on division of land grant deductions. The defendants, and *579 each of them, as far as this record shows, had no knowledge on the matter whatsoever until after the agreements were filed by plaintiffs with the Government in 1934. If, as now claimed by defendants, plaintiffs desired and agreed to make joint routes and resultant joint rates with defendants, by executing their 1934 equalization agreements, and thereby jointly plaintiffs and defendants so acting could take traffic shipped by the Government from some other road or roads, we believe it would have caused at least one of the defendants or plaintiffs to approach the other with a suggestion in that connection. The record is barren on the subject.
Plaintiffs, although long urged by the Government to eliminate restriction in "C. F.A." Territory from their equalization agreements, when they did file them, acted purely from motives of acquiring Government traffic, by meeting competition of other carriers, or each other, who had actual land grant track or an equalization agreement competing with same, all in "C. F.A." Territory. There is no evidence of consideration having been given to traffic outside "C.F.A." Territory by the plaintiff carriers. Before the 1934 change, as well as others, was made in equalization agreements by plaintiffs they gave the matter of competition in "C.F.A." Territory an exhaustive investigation, and no other.
We conclude neither of the plaintiffs, jointly or individually, intended by their 1934 equalization agreement to equalize or absorb any land grant deductions in the Southwestern Territory served by defendants. On the contrary the weight of the evidence is overwhelming that they did not intend to do so. The reason is apparent and fundamental. It would not have been to their financial advantage to do so.
What was the result of plaintiffs executing their 1934 equalization agreements? Do they show any intention, by implication or as a matter of law, contrary to what has been stated?
By their 1934 agreements with the Government plaintiffs made themselves equal, in so far as competition was a factor, with all land grant mileage, actual or competitive, in Central Freight Association Territory. By its 1934 agreement the plaintiff New York Central served Cairo, Illinois, and could there meet the defendant Missouri Pacific for transportation from Cairo to Texarkana, Texas. On the line of the Missouri Pacific described, part of the track was over statutory land grant. On traffic moving through St. Louis the plaintiffs were able to make delivery to the Frisco, which also had statutory land grant mileage. Other carriers operating in Southwestern Territory, such as the Cotton Belt and land grant carriers competing with one another, had a competitive problem in their territory  such as the plaintiffs had  and had met in "C.F.A." Territory.
The fact that operating under the 1934 agreements plaintiffs were able to make delivery to the defendant carriers, and defendants to plaintiff carriers, at the gateways mentioned, with the result that the Government by taking advantage of the land grant agreement, or land grant agreement with actual land grant, of each of the parties, could route its freight from points in "C.F.A." Territory into or from Southwestern Territory and such freight would move over the same routes as the parties used on some commercial traffic, cannot change the intention of the parties in executing their equalization agreements with the Government, nor impose on them a burden not intended. The parties did not make such routes in the sense "joint routes" are made by carriers, that is by mutual agreements. The Government shipments moved in each territory at the reduced rate, resulting from and based on land grant, or land grant agreements, with carriers in that territory, and no other, and the result was transportation from one territory into another under land grant equalization agreements or land grant. This transportation defendants choose to call "over joint routes"  but mere names or terms or results cannot change the intention or legal effect of individual contracts of the parties with the Government. It cannot be denied the measure of each carrier's business in transportation of Government traffic was one of two things, either its actual land grant or its individual land *580 grant agreement with the Government. A joint agreement between either of plaintiffs and either of defendants existed in no case to control the traffic. So much for the intention of the plaintiffs and defendants.
What of the instruments themselves  the 1934 equalization agreements of plaintiffs? Do they hide the intention of the parties? Were the defendants misled by the terms of the agreements as to the purpose and intent of the plaintiffs? What was the true intent and meaning of the 1934 land grant agreements as gathered from the instruments as a whole?
One of the main witnesses for the defendants, Mr. Dunham, the one whose decision originated this litigation, testified:
"Q. So you recognized in 1934, did you not, that the amount of revenue that the Central roads were entitled to receive was governed by the terms of the central roads equalization agreements. A. And our own, yes.
"Q. Well, your own did not change, though. The only change that was made was in those of the central road."
The brief of Guy A. Thompson states the effect of the 1934 agreements as follows:
"* * * During this latter period, each of the plaintiffs and each of these defendants had wide-open and unrestricted equalization agreements which obliged them to protect the lowest net rates available without any limitation as to what land-grant rates any one of them would equalize or participate in."
The Cotton Belt puts it this way:
"By the equalization agreements filed in 1934, plaintiffs joined with us in equalizing all land-grant deductions from origin to destination without limitation to any specified mileage."
The Frisco, probably because of its acceptance of plaintiffs' territorial method of settlement until 1942, does not rely so completely on the 1934 agreements, but states the proposition somewhat differently:
"Prior to September 1, 1934, the individual equalization agreements of the plaintiffs contained exceptions restricting their participation in equalization of the land grant mileage of the Illinois Central Railroad Company in the State of Illinois to specified portions thereof, and of the land grant mileage in the State of Michigan to the specified portions thereof."
The equalization agreements of 1934 signed by the plaintiffs were standard forms used by the Federal Government. Those provisions involved in the present question are alike in all three contracts of the plaintiffs. We choose the contract of the Baltimore & Ohio:
"1. The Baltimore and Ohio Railroad Company hereinafter called this carrier, hereby agrees, subject to the conditions and exceptions stated below, to accept for the transportation of property shipped for account of the Government of the United States and for which the Government of the United Sates is lawfully entitled to reduced rates over land-grant roads, the lowest net rates lawfully available, as derived through deductions account of land-grant distance from lawful rates filed with the Interstate Commerce Commission or the various State Commissions applying from point of origin to destination at time of movement.
"2. Conditions 
"(a) On traffic destined to and/or received from points on lines of other carriers this agreement will apply in connection with such carriers as have an agreement of the form stated in paragraph 1 above on file with the Quartermaster General, War Department, Washington, D. C., except as otherwise provided under the heading of Exceptions in paragraph 3 below.
"(b) On traffic destined to and/or received from points on lines of other carriers this agreement is subject also to the exceptions in the agreements of each individual carrier forming part of the through route of movement, on file with The Quartermaster General, War Department, Washington, D. C., except as may be otherwise provided under the heading of Exceptions in paragraph 3 below.

* * * * * *
*581 "5. This agreement cancels all previous equalization agreements, if any, on freight traffic filed by this carrier.
 "Respectfully submitted,
 "The Baltimore and Ohio Railroad
 Company.
 (Name of carrier)
 "J. T. Lean,
 (Authorized representative)
 "General Freight Traffic Manager.
 (Title)
"Accepted for The Quartermaster General.
"By: C. L. Middleton, Major, Q. M. C., Ass't.
"Date: October 4, 1934. (Executed in triplicate)
 "Note: Three signed copies to be forwarded
 to The Quartermaster
 General, one of which will be
 returned to the carrier upon acceptance."
 (Emphasis Added.)
We find nothing in the terms of these agreements from which it could be fairly and reasonably deducted, either expressly or by implication, that plaintiffs were from and after the date thereof offering to absorb any land grant deductions outside of the Territory in which they operated, or "C.F.A." Territory. We cannot make new contracts for the parties or read into them something that is not there. The absence of such agreement does not create it. The absorbing land grant deductions was the result of an affirmative act, not the failure to act. The Government intended no such construction to be placed on its "standard" form agreements as defendants now contend for. This is shown by the correspondence of the Government in the record. A letter from the office of Chief of Transportation, dated December 6, 1943, is typical (Prior Record, p. 125):
"The standard freight land-grant equalization agreement filed by rail lines carries the following `Condition (b)':
"`(b) On traffic destined to and/or received from points on lines of other carriers this agreement is subject also to the exceptions in the agreements of each individual carrier forming part of the through route of movement, on file with the Chief of Transportation, War Department, Washington, D. C., except as may be otherwise provided under the heading of "Exceptions" in paragraph 3 below.'
"This condition serves, practically, as a safeguard of each line against ex parte action by another line which might affect the proportions of land-grant `shrinkage' as among various lines in a joint route."
There is other evidence in the record showing that at no time did the Government consider that a carrier by its land grant agreements would absorb any "land grant shrinkage" outside the territory it operated in, was competitive to, unless the agreement expressly so provided, as the defendants did on occasion. The Government never claimed a railroad absorbed land grant deductions by implication but only by express contract so providing.
The agreements can only mean and were only intended to mean that each carrier by its own equalization agreement controls the extent and limit of land grant "shrinkage" it will absorb. There can be no foundation in reason and logic for plaintiffs to agree to absorb any "land grant shrinkage" outside of "C.F.A." Territory and therefore beyond its competition, when to do so would decrease the revenue it would receive for the transportation or carriage over its line of government freight. Railroads are business institutions. They are interested in the financial return of their companies and avoid any action that will decrease their revenue, if knowledge of such hazard is brought home to them. Defendants are not immune from such motives or knowledge of such motive on the part of other carriers. Such is the motive that has prompted this controversy, first by defendants and second by plaintiffs.
In light of financial interest of the parties, we pass to what we consider the most severe test that could be given the meaning of the 1934 agreements executed by plaintiffs. What was the reaction of defendants to them? If the implication is apparent on their face, together with the circumstances, that plaintiffs had agreed to absorb part of the "land grant shrinkage" of the Southwestern roads, or that such was the result because of land grant equalized by the 1934 *582 agreements, defendants would be expected to react promptly to the opportunity to demand and to increase their revenues  and be able to state their reason for such demands in plain and consistent terms. The 1934 agreements became effective in September of that year (New York Central, October). Mr. Dunham, who originated the pro-rate practice, when asked how he learned of the 1934 agreements, testified:
"Q. What was the first knowledge you had of those agreements; did they talk with you about it, I mean the representatives of the eastern roads? A. No.
"Q. Before they filed them? A. No. sir.
"Q. How did you first learn it? A. Through a circular issued by the War Department in Washington.
"Q. You got that knowledge from the War Department after the agreement was filed? A. That is right. When the equalization agreements are filed they are filed by the individual carrier with the Quartermaster at Washington. The Quartermaster then publishes a circular showing just exactly what that equalization agreement is. It carries all the terms and conditions and exceptions.
"Q. When you got that circular that was your first knowledge? A. That is right.
"Q. When you read these agreements of the three plaintiffs, from reading them did you understand that it was the intent of the plaintiffs by those agreements to authorize you to settle on a pro rate basis? A. It was their intent to fully equalize rates.
"Q. Just answer my question. A. Yes sir.
"Q. As you read those agreements you concluded that it was the intent of the plaintiffs to authorize you where you were the settling carrier, I mean the western carriers to settle on the pro rate basis? A. On the pro rate basis.
"Q. You got that understanding, that that was their intent from reading the document? A. From reading the equalization agreement."
 (Trans. Vol. II, pp. 649, 650)
The procedure by which the Missouri Pacific put into effect the change in method of making division of land grant revenue is not without bearing on the issue. Such a change was not a trifling matter. It was departure from a custom and practice existing between plaintiff and defendant roads for many years  well over twenty-five. It was the inauguration of an entirely new concept in division of land grant deductions. It involved large sums of money. It would be expected to result from a decision of top-ranking officials if not resulting from opinion of the legal department on meaning of plaintiffs' 1934 agreements. But the record shows an assistant general freight agent was "solely" responsible for the change and he did not "consult" with "other people" before making the change. We quote his testimony:
"Q. Did Mr. Wilson, who testified in the previous case, make the decision to start [stop] settling with the Central roads on a territorial basis? That is, in 1934? A. No sir, he did not.
"Q. Was he consulted on that? A. No sir.
"Q. Did your freight traffic manager do that? A. To change from the territorial?
"Q. Yes. A. No. The freight traffic manager did not.
"Q. Who did? A. I did it.
"Q. You did it? A. Yes sir.
"Q. Well, you consulted with those other people, though. A. No, I did not.
"Q. You did it on your own? A. That is right.
"Q. So you are the man who was responsible for starting this shooting match. A. As far as the Missouri Pacific is concerned, yes.
"Q. Were you an assistant general freight agent at that time? A. I was."
 (Trans., Vol. II, pp. 615, 616)
The War Department did not issue its circular until after "February 6, 1935," so it was approximately six months after the filing of the 1934 agreements before defendant Missouri Pacific learned of it. Yet as to each of the defendants they plead:
"* * * plaintiffs * * * (by the 1934 agreements) thereby joined with these defendants *583 in creating equalization routes to which traffic in this suit was diverted from the competitive land grant routes."[4]
We find a total absence of any "joint" action on the part of any plaintiff and defendant. If defendants mean the effect or result was to create use of routes of carriers in both territories by the Government, as it may determine a movement, we fail to see how that circumstance, standing alone  and it does stand alone  could force plaintiffs to absorb any land grant deductions in Southwestern Territory unless it agreed to do so.
The language in the agreement  "from point of origin to destination at time of movement"  was conditioned as to "traffic destined to and/or received from points on lines of other carriers," that such "other" carriers had a like agreement, which would obligate such carrier to absorb the land grant it was competitive to. When this is read in light of the history of prior settlement of land grant deductions as between connecting carriers, that it had always been on a territorial basis, it cannot be held to be subject to the construction, authorizing a change to a pro-rate method of settlement as now claimed by defendants.
It was a long time, many years in fact, before either of the defendants reached the point of urging such a construction.
Mr. Dunham for the Missouri Pacific started the new system of pro-rating land grant deduction in making settlements some time after February, 1935. The record is silent on circumstances of change by the Cotton Belt. The Frisco continued to settle with plaintiff roads on the territorial basis until September, 1942, or approximately eight years after filing by plaintiffs of their 1934 agreement. We find no plausible explanation in the record for this action by the Frisco consistent with defendants' position in this case, as set forth in their pleadings. The factual situation was the same before 1942 as respects this defendant and plaintiffs.
The action of the Missouri Pacific and Cotton Belt in changing, to their benefit, method of settling with plaintiff roads on land grant deductions, immediately brought a protest from plaintiffs, a protest that has continued to this day. Plaintiffs have always and consistently demanded and contended that settlements of land grant deductions should be on the territorial basis. How did defendants meet plaintiffs' protests? How did they attempt to justify their action in withholding from plaintiffs sums plaintiffs claimed to be due them, on the territorial basis of settlement, where defendants were the collecting carriers? Has their position been consistent? Plaintiffs complained to the War Department to no avail. Plaintiffs tried to settle the dispute direct with the Southwestern roads. Failing that plaintiffs took the matter to their rate associations. There were many meetings held by the rate associations in both territories. As late as July 1943 defendants speaking through their representatives were not definite in their position. See Exhibit 18, pages 8 and 9, for a report of one such meeting:
"The position of some of the Southwestern Lines, particularly the Missouri Pacific, was that, under the agreement as now on file with the Commission, the C.F.A. Lines were obligated to take revenue based on the net land grant rate. Some of the other Southwestern Lines are not in agreement with this position. The Southwestern Lines then advised that they would like an opportunity to give further study to the subject and asked the C.F.A. Lines to defer any action until they had an opportunity to further consider the C.F.A. proposal in a meeting of all of their lines. The Western Trunk Lines likewise asked that they be afforded more time to study the C.F.A. proposal. Mr. Stubbs, for account of the Transcontinental Lines, stated that so far as he knew there was no difficulty with the Transcontinental Lines in that his understanding was that the Transcontinental Lines were assuming the entire amount of land grant which accrued in Western territory, *584 whether the traffic moved over the land grant line or via an equalizing carrier. He said that there were some questions that he would like to submit to his railroads and that before giving a final answer he would like to submit the matter to his railroads, and in the meantime there would be no change in the position of the Transcontinental Lines."
Failing to come to an agreement, the defendants in this action as plaintiffs filed a suit, with the plaintiffs in this action as defendants, in November 1943. In the complaint the plaintiffs (defendants here) solemnly alleged as the basis of their claim that plaintiff carriers must accept and make settlement of land grant deductions on joint line traffic on the pro-rate method (as originated solely by Mr. Dunham in 1935) on and after the filing of their 1934 equalization agreements, because
"* * * plaintiffs and defendants herein * * * acting by or through their duly authorized agents * * * entered into a written contract * * * effective April 1, 1940 * * * [the object of which was to] avoid and prevent future controversies as to apportionment of" or division of revenue on Government freight moving under equalization agreements of the parties.
It was further stated in the complaint:
"* * * plaintiffs and defendants agreed, as set forth in the contract described in Paragraph IV herein, and further identified as Exhibit A attached to this complaint, that they should not receive any different percentage of the freight charges for the movement of Government freight charges than they do for the movement of commercial freight."
The agreement referred to was division sheet 200-A. It is no longer subject to the claim asserted by defendants (in this case) by decision of the Court of Appeals.
There is a further circumstance surrounding the pendency of the suit just referred to which throws some light on defendants' present claim as to the effect of and their rights, based on the 1934 equalization agreements of plaintiffs. Plaintiffs filed amended equalization agreements in 1943, expressly stating their position not to absorb any land grant deductions outside "C.F.A." territory. In answer to a communication from the War Department on the subject the defendants wrote the War Department, on December 20, 1943, a letter which contains the following:
"The divisions of land-grant rates and the apportionment of the revenue derived therefrom between Official and Southwestern territories were prescribed by the Interstate Commerce Commission, and, effective April 1, 1940, the Official and the Southwestern carriers cancelled all divisions in effect prior thereto and agreed that all joint rates should be divided on the percentages named in the current division sheets. The question of the applicability of these division sheets to the apportionment of land-grant rates between the two territories aforesaid is now before the Court, including the validity of exception (d) in the new freight land-grant equalization agreement of the Eastern Lines effective January 1, 1944, and until determination of that litigation we cannot agree to the proposed method of the Eastern Lines of dividing the net land-grant rates between these two territories." (Emphasis added.)
The litigation was terminated; defendants' position was denied. Defendants still "do not agree to the proposed method of the Eastern Lines," and now come forward with different theory to support pro-rate method of settlement. This history leaves the Court with the impression that defendants' present position was arrived at by virtue of a strained construction by them of the 1934 agreements and not a fair and reasonable one. Had it been as plain as defendants now declare, that by the 1934 agreements plaintiffs agreed to the pro-rate system of settling land-grant deductions, on any theory, defendants doubtless would have formed their forces on that battle line from the start.
The brief of defendant Missouri Pacific calls for comment at this point. The equalization agreements filed by this line in 1939 eliminated a provision in its prior agreement whereby it equalized some land grant in "C.F.A." Territory. This defendant now states:
"Another effect of this change is that it entirely removes any suggestion of merit *585 from the plaintiffs' cause of action as to traffic moving since May 18, 1939."
Should this be received by the Court as admitting validity of plaintiffs' claim on traffic prior to "May 18th, 1939," as to this defendant? This defendant says:
"It appears that the Court might conclude that the division of that portion of the joint revenue accruing on this interterritorial traffic for the period ending May 18, 1939, was settled by agreement as evidenced by the individual lines' equalization agreements. As to the revenue for subsequent years, there is no agreement, and the division of that revenue is what is in issue."
That this defendant is conceding liability for period prior to "May 18, 1939," may be further indicated by a later part of its brief:
"We therefore submit that, from 1939 to October 1, 1946, the effective date of the repeal of the Land Grant Statute, each of the plaintiffs and each of these defendants was obliged to protect the lowest net rates lawfully available to the Government on the traffic involved, without any reservations whatsoever as to what individual land-grant rates any one of them would equalize. Neither contract, nor statute, nor equity supports or justifies the plaintiffs' claims to the contrary."
This defendant's line of reasoning seems to be that because it equalized by its agreements with the Government some land grant in "C.F.A." Territory prior to 1939, that filing of a new equalization agreement by it with the War Department on May 18, 1939, it thereby affected and changed its obligation to account to plaintiffs for land-grant deductions as it had theretofore been legally bound to do. Is this position consistent with this defendant's pleading in this case of "joint" action by the parties in 1934? Neither of the plaintiffs filed new agreements in 1939. Plaintiffs, so far as this record shows, had no knowledge of defendant's 1939 agreement until after it was filed, any more than each of the defendants had knowledge of plaintiffs' 1934 agreements until months after they were filed.
We conclude the evidence supports the position of plaintiffs that their 1934 agreements did not obligate them to assume any land grant equalization deductions outside "C.F.A." Territory and defendants' action in withholding funds from plaintiffs due them on the territorial basis of settlement of land grant deductions was without authority or justification in law or equity.
If the 1934 agreements of plaintiffs did not change the rights and interest of plaintiffs and defendants in money collected for transportation of Government freight under equalization agreements, and we hold they did not, then the 1943 agreements filed by plaintiffs likewise did not change the status of such funds.

IV.
Passing to the claim of defendants that plaintiffs' 1934 and 1944 equalization agreements are rate-making agreements and "had no bearing on the apportionment of revenue on traffic moving under rates" fixed by such agreements (Frisco Brief, p. 40), we cannot agree with their contention that Division Sheet 200-A should be recognized as a formula for division of revenue from such traffic. Division Sheet 200-A followed and was made to comply with an order of the Interstate Commerce Commission prescribing divisions on commercial revenue. The Commission has never had the subject of division of land grant revenue before it. It has no power in the premises. The fundamental weakness of defendants' contention in this respect is the difference between commercial revenue and land grant revenue as fixed by the equalization agreements or actual land grant with the Government. The parties should not be heard to assert that it is not equitable and just to proceed after 1934 in the manner agreed to, that is equalize with competing land grant mileage in the territory served by them or to do what they are forced by law to do where transportation is over actual land grant track. Defendants are without a legal basis to force plaintiffs to absorb any land grant in Southwestern Territory. The prorate method does; the territorial method *586 does not. For over twenty-five years the defendants divided such revenue without any claim of lack of equity or justice in the territorial method of settlement. There is nothing in the 1934 agreements changing the equities and justice of such procedure.
Cotton Belt asserts it has no land grant. Such has always been its status. The same is true of one of the plaintiffs. But each of them to compete in the territory served by it executed equalization agreements. Before doing so they considered the land grant they were equalizing and contracted with the Government accordingly and solely as they willed. There is no inequity or injustice in such parties absorbing that land grant in the territory served by them to which they are competitive, and which is covered by their agreements.
We find according to the weight of the testimony the territorial basis of settlement has been recognized by the railroad industry generally for over a quarter of a century as the fair and equitable method of division of land grant revenue on traffic between territories. It was the settled custom and practice of the industry until two of the defendants started the pro-rate method in 1934.
A number of Southwestern lines[5] competitive with defendants settled on the territorial basis after 1934 until repeal of the Land Grant Statute.
The railroads operate the Railway Express Company. In 1943 they unanimously agreed that on carload shipments the territorial basis of settlement (as maintained by plaintiffs) would be followed by all roads in settling for Government shipments over land grant or equalizing routes. So far as this record shows this agreement was carried out. The agreement was originated by the carriers "to insure equitable treatment to all carriers * * *." Two of the defendants had a representative on the Committee that formulated the plan.
Settlements on forwarder traffic is another instance of defendants' acquiescence in the territorial method followed by carriers generally in settling for Government traffic during the War. Standing alone it might be explained away but with other facts in the case it is some evidence of a consistent policy by the carriers.
The deposition of Mr. Cleveland, Vice President of the Association of American Railroads, was offered in evidence. One of the defendants recognized him as an expert on the subject of just and equitable division of land grant deductions as between carriers operating in different territories. He was solicited by one of the defendants for his opinion. It was considered that he "be called upon to * * * settle" this controversy or "the War Department may call upon you for expert advice" on the subject of this controversy. The answer of Mr. Cleveland to this inquiry was adverse to defendants' present position. After stating his thorough acquaintance with the subject Mr. Cleveland gave an opinion sustaining the position of the plaintiffs as to the territorial method of making division of land grant deductions as between carriers in different rate territories.
Estoppel pled in answers is not briefed. We assume it has been abandoned as a defense.
We conclude that plaintiffs have carried their burden of proof, that the true meaning of the equalization agreements filed by plaintiffs in 1934, the terms of which were continued in effect to the repeal of the Land Grant Statute by the 1944 agreements, is that plaintiffs would equalize only the land grant deductions accruing in Central Freight Association Territory, such meaning governed the revenue to be received for carriage of Government freight under such equalization agreements by plaintiffs; the territorial method of settlement as between plaintiffs and defendants is just and equitable and all funds collected by defendants for such Government traffic and for which they have failed to account to plaintiff because of failure to follow such system of settlement, is held in trust by defendants for plaintiffs and plaintiffs are entitled to accounting of same.
Let findings of fact, conclusions of law, and interlocutory decree pending settlement of account question, be presented.
NOTES
[1] In 1948 Revision, 28 U.S.C.A. § 1391.
[2] Preliminary print.
[3] "Charges for transportation by land-grant railroads subject to regulation by Congress. Payment shall be made at such rates as the Secretary of War shall deem just and reasonable and shall not exceed 50 per centum of the full amount of compensation, computed on the basis of the tariff or lower special rates for like transportation performed for the public at large, for the transportation of property or troops of the United States over any railroad which under land-grant acts was aided in its construction by a grant of land * * * subject to such regulations as Congress may impose restricting the charge for such Government transportation, and such payment shall be accepted as in full for all demands for such service."
[4] As we understand the law and this record there is no distinction between "equalization routes" and "competitive land grant routes". They are one and the same.
[5] Santa Fe; Rock Island; Kansas City; Southern.